COMMONWEALTH vs. HUBERT DAVIS.

Suffolk.  January 5, 1976. — March 9, 1976.

Present: HENNESSEY, C.J., REARDON, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Firearms.  Constitutional Law,* Right to keep and bear arms.

General Laws c. 269, § 10 (as amended through St. 1973, c. 588),
    which provides penalties for the illegal possession of a shotgun
    with a barrel less than eighteen inches long, does not violate article
    17 of the Massachusetts Declaration of Rights since article 17 is
    intended to provide for the common defense and not to guarantee
    individual ownership or possession of weapons [887-890]; nor does
    it violate the Second Amendment to the United States Constitution
    since that amendment inhibits only the national government, not
    the States [890-891].

INDICTMENT found and returned in the Superior Court
on March 6, 1974.

The case was heard by *McNaught, J.,* and a motion
for a new trial was heard by him.

After review was sought in the Appeals Court, the Su-
preme Judicial Court, on its own initiative, ordered direct
appellate review.

The case was submitted on briefs.

*Ronald J. Chisholm* for the defendant.

*Joseph I. Mulligan,* Assistant District Attorney, &
*Joseph J. Maher, Jr.,* for the Commonwealth.

KAPLAN, J.  In connection with a search under warrant
of an apartment for narcotic drugs, the police found fire-
arms and ammunition evidently in the possession of the
defendant Hubert Davis.  The defendant was indicted
under G. L. c. 269, § 10 (as amended through St. 1973,
c. 588) for illegal possession on January 4, 1974, of a

shotgun with a barrel less than eighteen inches long,[1] and he was found guilty of this crime after trial by a judge of the Superior Court sitting without a jury. On motion for a new trial, the defendant contended that the statute defining and punishing the offense violated his constitutionally guaranteed right to keep and bear arms, and he assigned error accordingly to the denial of his motion. Appeal having been lodged in the Appeals Court, we took the matter on our own initiative for direct review under G. L. c. 211A, § 10 (A).

Article 17 of our Declaration of Rights declares: "The people have a right to keep and to bear arms for the common defence. And as, in time of peace, armies are dangerous to liberty, they ought not to be maintained without the consent of the legislature; and the military power shall always be held in an exact subordination to the civil authority, and be governed by it."

The meaning of such provisions is to be gathered from their history which is reasonably well known and need not be reviewed here in detail. See Feller & Gotting, The Second Amendment: A Second Look, 61 Nw. U.L. Rev. 46 (1966); Levin, The Right to Bear Arms: The Development of the American Experience, 48 Chi.-Kent L. Rev. 148 (1971). The colonists distrusted standing armies and preferred to look to a militia — "civilians primarily, soldiers on occasion"[2] — for protection. Article 17 expresses the distrust in its second sentence. It

---

[1] Section 10 read in part as follows: "Whoever, except as provided by law, possesses a shotgun with a barrel less than eighteen inches in length, or possesses a machine gun, as defined in section one hundred and twenty-one of chapter one hundred and forty, without permission under section one hundred and thirty-one of said chapter, shall be punished by imprisonment in the state prison for life or for any term of years."

Section 10 was rewritten by St. 1974, c. 649, § 2, and further amended by St. 1975, c. 113, §§ 2 and 3, and c. 585, § 1, all inapplicable to the present case.

[2] *United States* v. *Miller*, 307 U.S. 174, 179 (1939).

refers to the preference in the first: the declared right to keep and bear arms is that of the people, the aggregate of citizens; the right is related to the common defense; and that in turn points to service in a broadly based, organized militia. Provisions like art. 17 were not directed to guaranteeing individual ownership or possession of weapons. See *Salina* v. *Blaksley*, 72 Kan. 230, 231-232 (1905); *Burton* v. *Sills*, 53 N.J. 86, 96-97 (1968). This generalization is perhaps subject to a qualification: Militiamen customarily furnished their own equipment and indeed might be under legal obligation to do so. See *United States* v. *Miller*, 307 U.S. 174, 179-181 (1939); *State* v. *Dawson*, 272 N.C. 535, 546 (1968). A law forbidding the keeping by individuals of arms that were used in the militia service might then have interfered with the effectiveness of the militia and thus offended the art. 17 right. But that situation no longer exists; our militia, of which the backbone is the National Guard, is now equipped and supported by public funds. See, e.g., G. L. c. 33, § 101 (payment by Commonwealth for clothing and equipment of units of its military forces). Moreover, the statute at bar is part of a large regulatory scheme to promote the public safety,[3] and there is nothing to suggest that, even in early times, due regulation of possession or carrying of firearms, short of some sweeping prohibition, would have been thought to be an improper curtailment of individual liberty or to undercut the militia system.[4] Very generally it has been held that such regulation is compatible with State constitutional provi-

---

[3] The instant statute is one feature of a large complex of legislation which relies not only on prohibitions but on controls of possession, carrying, and transfer of firearms through techniques of licensing and identification. It seems that a license for the carrying of a short barrelled shotgun was not excluded under G. L. c. 140, § 131, if a proper basis for such permission could be offered.

[4] Judge Goodrich pointed out in *United States* v. *Tot*, 131 F.2d 261, 266 (3rd Cir. 1942), rev'd on other grounds, 319 U.S. 463 (1943), that the bearing of weapons was not treated at common law as an

sions on the subject of the right to bear arms.[5]   Our own
case of *Commonwealth* v. *Murphy*, 166 Mass. 171 (1896),
is to that effect.[6]   It may be noted that some of the State
constitutional provisions can be distinguished from our
own because they speak of arms for self-defense as well as
for defense of the State; even so, a regulatory power is
not necessarily excluded.   See *People* v. *Brown*, 253
Mich. 537, 538, 540 (1931); *People* v. *McFadden*, 31
Mich. App. 512, 515-516 (1971); *State* v. *Robinson*, 217
Ore. 612, 615, 619 (1959).[7]

If art. 17 does not help the defendant, then he is re-
duced, as far as State law is concerned, to a claim that
the statute is beyond the police power.   But that would
involve an examination, in context, of the regulatory
scheme and of the particular statute as a part of the
scheme.   The record is barren of any of this, as is the de-
fendant's brief.   Presumptively the statute is valid as a
police measure; indeed a sawed-off shotgun seems a most

---

absolute right and had indeed been regulated as early as the Statute
of Northampton of 1328.   The English Bill of Rights of 1688 (St. 1
Wm. & Mary, 2d sess., c. 2) contained no general assurance of the
individual's right to bear arms; rather it denounced the discrimina-
tory arming of subjects, and seemed in terms to acknowledge a legis-
lative power of regulation.   The current English statutes are in fact
very restrictive of possession and carrying of weapons.   See *Burton* v.
*Sills*, 53 N.J. 86, 96 (1968).

[5] Cases are collected in Comment, The Philadelphia Firearms Ordi-
nance — A Case of Comprehensive Oversight, 114 U. Pa. L. Rev.
550, 553 (1966), and *Burton* v. *Sills*, 53 N.J. 86, 100-101 (1968).

[6] The *Murphy* case affirmed a conviction under St. 1893, c. 367,
§ 124, for belonging to and parading with an unauthorized body of
men carrying firearms (see, now, G. L. c. 33, §§ 129, 130).   The
opinion speaks of a police power to regulate the bearing of arms not-
withstanding art. 17.   See the treatment of the *Murphy* case in *Salina*
v. *Blaksley*, 72 Kan. 230, 233 (1905), and *State* v. *Dawson*, 272 N.C.
535, 547 (1968).

[7] The State constitutional provisions were brought together in Mc-
Kenna, The Right to Keep and Bear Arms, 12 Marq. L. Rev. 138 n.5
(1928).

plausible subject of regulation as it may be readily concealed and is especially dangerous because of the wide and nearly indiscriminate scattering of its shot. A Legislature might be justified in concluding that such weapons are associated with violent crime and call for strict licensing if not suppression.

The Second Amendment to the Constitution of the United States declares: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." This was adopted to quiet the fears of those who thought that the Congressional powers under article I, § 8, clauses 15 and 16, with regard to the State militias[8] might have the effect of enervating or destroying those forces. The amendment is to be read as an assurance that the national government shall not so reduce the militias. See *United States* v. *Miller,* 307 U.S. 174, 178 (1939); Feller & Gotting, *supra* at 62; Levin, *supra* at 159. Decisions of the courts have not retreated from the view that the amendment inhibits only the national government, not the States. See *Miller* v. *Texas,* 153 U.S. 535, 538 (1894); *Presser* v. *Illinois,* 116 U.S. 252, 264 (1886); *United States* v. *Cruickshank,* 92 U.S. 542, 553 (1875). So the amendment is irrelevant to the present case. The chances appear remote that this amendment will ultimately be read to control the States, for unlike some other provisions of the Bill of Rights, this is not directed to guaranteeing the rights of individuals, but rather, as we have said, to assuring some freedom of State forces from national interference. Apart from such interference,

---

[8] These clauses empower Congress to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions" and to "provide for organizing, arming, and disciplining, the Militia, and for Governing such Part of them as may be employed in the Service of the United States, reserving to the States, respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress."

Congress is not inhibited by the amendment from regulating firearms by exercise of its interstate commerce or other powers, and it has done so on a considerable scale with judicial approval. *United States* v. *Miller,* 307 U.S. 174, 177-178 (1939).[9]  *Cases* v. *United States,* 131 F.2d 916, 921-923 (1st Cir. 1942), cert. denied sub nom. *Velazquez* v. *United States,* 319 U.S. 770 (1943). *United States* v. *Tot,* 131 F.2d 261, 266-267 (3d Cir. 1942), rev'd on other grounds, 319 U.S. 463 (1943). *United States* v. *Johnson,* 497 F.2d 548, 550 (4th Cir. 1974). *United States* v. *Day,* 476 F.2d 562, 568 (6th Cir. 1973). *United States* v. *Synnes,* 438 F.2d 764, 772 (8th Cir. 1971), vacated on other grounds, 404 U.S. 1009 (1972). Should the amendment perchance be held in the future to restrain the States in some fashion, one would suppose that the States' regulatory authority would remain.

We affirm the denial of the motion for a new trial. We also affirm the judgment of conviction, from which an appeal was taken, but not pressed.

*So ordered.*

---

[9] In upholding Federal legislation prohibiting the transportation in interstate commerce of a short barrelled shotgun (except under stated conditions, not satisfied), the Court in the *Miller* case noted that there was no evidence to show that possession or use of the weapon had "some reasonable relationship to the preservation or efficiency of a well regulated militia" or that it was "any part of the ordinary military equipment or that its use could contribute to the common defense." 307 U.S. at 178. From this one might possibly infer that Congress could not regulate weapons having military uses, and that Congress was left, as Judge Woodbury observed, only with the power to deal with the flintlock musket and matchlock harquebus. *Cases* v. *United States,* 131 F.2d 916, 922 (1st Cir. 1942), cert. denied sub nom. *Velazquez* v. *United States,* 319 U.S. 770 (1943). The inference is quite unacceptable and the congressional power has been held to have the breadth noted in our text.