## COMMONWEALTH *vs.* NATHANIEL DEPINA.

Bristol. November 5, 2009. - March 10, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Firearms. Constitutional Law,* Search and seizure, Investigatory stop, Confrontation of witnesses, Harmless error, Right to bear arms. *Search and Seizure,* Threshold police inquiry, Reasonable suspicion. *Threshold Police Inquiry. Evidence,* Ballistician's certificate. *Practice, Criminal,* Confrontation of witnesses, Harmless error. *Error, Harmless.*

A Superior Court judge properly denied the criminal defendant's pretrial motion to suppress evidence of a firearm that police officers, acting in reliance on a police dispatch, confiscated after stopping the defendant to question him, where, at the time of the stop, the police had reasonable suspicion, based on specific and articulable facts, that the defendant had committed a shooting, given that the information on which the dispatch was based (i.e., a telephone call from an excited, although anonymous, eyewitness) had sufficient indicia of reliability, and given that the less than distinctive physical description provided in the dispatch was supplemented by the defendant's physical proximity to the crime scene, the closeness in time to the dispatch, the defendant's obvious effort to avoid encountering the police, and the danger to public safety. [241-247]

At the trial of indictments charging the defendant with the illegal carrying of a firearm and the unlawful carrying of a loaded firearm, the admission in evidence of a ballistics certificate of examination without providing the defendant the opportunity to cross-examine the analyst who created the certificate, although violative of the defendant's right to confront witnesses against him, was harmless beyond a reasonable doubt, where the lawfully admitted evidence that the revolver in question was a working firearm and that the ammunition in question was designed for use in a firearm was so overwhelming as to nullify any effect the erroneously admitted evidence might have had on the jury or the verdict. [247-251]

This court concluded that G. L. c. 269, § 10 (*a*) and (*n*), and the licensing scheme that the statute enforces, do not infringe on the limited, personal right under the Second Amendment to the United States Constitution to keep and bear arms for the purpose of self-defense, because under current Federal law, the Second Amendment does not apply to the States; further, this court concluded that G. L. c. 269, § 10 (*a*) and (*n*), and the licensing scheme that the statute enforces, do not violate art. 17 of the Massachusetts Declaration of Rights, which recognizes no individual right to keep and bear arms. [251-253]

INDICTMENTS found and returned in the Superior Court Department on August 16, 2007.

.

A pretrial motion to suppress evidence was heard by *David A. McLaughlin,* J., and a motion for reconsideration was considered by him; the cases were tried before *E. Susan Garsh,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Paul W. Patten* for the defendant.

*Rachel J. Eisenhaure,* Assistant District Attorney (*David J. Gold & Shoshana E. Stern,* Assistant District Attorneys, with her) for the Commonwealth.

*Jonathan E. Lowy & Daniel R. Vice,* of the District of Columbia, *& Scott Harshbarger, Allison K. Jones, & Gil N. Peles,* for Brady Center to Prevent Gun Violence & others, amici curiae, submitted a brief.

GANTS, J. On August 19, 2008, a jury convicted the defendant of the illegal carrying of a firearm, in violation of G. L. c. 269, § 10 (*a*), and the unlawful carrying of a loaded firearm, in violation of G. L. c. 269, § 10 (*n*).[1] On appeal, the defendant argues that (1) the motion judge erred in denying his motion to suppress the loaded firearm; (2) the trial judge's admission in evidence of a ballistic expert's certificate of examination regarding the firearm and ammunition violated his right to confrontation as set forth in *Melendez-Diaz* v. *Massachusetts,* 129 S. Ct. 2527 (2009); and (3) his convictions violated his individual, constitutional right to bear arms as set forth in *District of Columbia* v. *Heller,* 128 S. Ct. 2783 (2008). We granted the defendant's application for direct appellate review. We now affirm the defendant's convictions.[2]

1. *The motion to suppress.* a. *Facts.* We summarize the facts concerning the stop of the defendant and the seizure of the firearm as found by the motion judge, supplemented where

---

[1] The jury also convicted the defendant of the unlawful possession of ammunition, in violation of G. L. c. 269, § 10 (*h*), but this conviction was dismissed before sentencing as duplicative of the conviction of unlawful carrying of a loaded firearm.

[2] We acknowledge the amicus brief filed in support of the Commonwealth by the Brady Center to Prevent Gun Violence together with the International Brotherhood of Police Officers, the Legal Community against Violence, the Massachusetts Chiefs of Police, the Massachusetts Million Mom March Chapter of the Brady Campaign to Prevent Gun Violence, and Stop Handgun Violence.

necessary with uncontroverted evidence drawn from the record of the suppression hearing.[3]

On the evening of July 24, 2007, State Troopers Anthony Watson and Mark Cyr, together with Federal Bureau of Investigation (FBI) Special Agent Michael Doyle, were assigned to duty in New Bedford as members of a joint State police-FBI gang task force. At approximately 9:46 P.M., while they were near the United Front housing project, they heard a broadcast of a police officer's request for an ambulance to treat the victim of a shooting that had just occurred in the immediate vicinity. Immediately thereafter, a State police dispatcher broadcast a report that a white or Hispanic male wearing a white T-shirt and blue shorts had been seen running down Chancery Street, near where the shooting had occurred.

The information regarding the person fleeing the scene came from an anonymous caller to an emergency 911 line. She told police that she was "on Middle Street" and had heard two to three shots on Chancery Street, in her "back yard." She had not seen the shooting, but she had seen a person running toward Kempton Street after the shooting. She described the fleeing person as a "tan" colored "kid"; she said he was wearing a white shirt, blue "jean" shorts, and a hat.

Traveling in an unmarked police cruiser, the three officers searched for the suspected shooter in the streets immediately surrounding the housing project. The officers stopped two men wearing white T-shirts and blue shorts, each at different locations, but quickly determined that neither had been involved in the shooting. As the officers drove down Union Street, Trooper Cyr observed a third person on Emerson Street wearing a white T-shirt and dark shorts, within two to three blocks of the scene of the reported shooting. The officers drove south on Emerson Street, stopped their cruiser in the middle of the street near the defendant, and left the vehicle to approach the defendant. The defendant, who had been heading south on a sidewalk on Emerson Street, pedaling a foot scooter, reversed direction and began

---

[3]The motion judge, who was not the trial judge, issued a memorandum denying the defendant's motion to suppress in which he set forth his findings of fact and rulings of law. He later supplemented these findings and rulings in a memorandum of decision and order that denied the defendant's motion for reconsideration. Our summary draws from both memoranda.

traveling north on Emerson Street, away from the approaching officers.

The officers were dressed in dark T-shirts marked with the words "Gang Unit" on the back, blue jeans, and sneakers. Trooper Watson and Trooper Cyr's T-shirts both bore clearly marked State police emblems on the front; Special Agent Doyle's T-shirt was marked "FBI" on the front. All three wore gun belts that held firearms, police radios, and handcuffs. Trooper Watson and Trooper Cyr also displayed their State police badges on their belts.

As they advanced toward the defendant, Trooper Watson said to him, in substance, in a "normal voice," "Can I talk to you? Can you come over here?" The defendant stopped, looked over his shoulder at Trooper Watson, and made quick motions with his hands in the area of his waistband. The officers then heard an object hit the ground with the sound of "[m]etal on pavement," and Trooper Watson immediately seized the defendant's hands and drew the defendant toward him and away from the object the defendant had dropped. Using a flashlight, Special Agent Doyle located the object and called out that the defendant had dropped a gun. Trooper Watson and Trooper Cyr handcuffed the defendant, placed him under arrest, and advised him of his Miranda rights.

b. *Discussion.* In reviewing the denial of a motion to suppress, we accept the judge's findings of fact absent clear error. *Commonwealth* v. *Alvarado*, 420 Mass. 542, 544 (1995). Because we find no clear error of fact that is material, our legal analysis focuses on "the correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004), quoting *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996).

The defendant argues that he was seized (or stopped in the constitutional sense) by the police once Trooper Watson asked to speak with him and that, at that moment, the police did not have reasonable suspicion to justify the stop. The Commonwealth contends that the stop did not occur until Trooper Watson grabbed the defendant's hands after hearing the metallic clang of a dropped firearm.

The police do not seize a person whenever they seek to question him. *Commonwealth* v. *Stoute*, 422 Mass. 782, 789 (1996)

("not every encounter between a law enforcement official and a member of the public constitutes an intrusion of constitutional dimensions requiring justification"). Rather, a person is seized under art. 14 of the Massachusetts Declaration of Rights "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Commonwealth* v. *Barros,* 435 Mass. 171, 173-174 (2001), quoting *United States* v. *Mendenhall,* 446 U.S. 544, 554 (1980) (opinion of Stewart, J.). "[T]he police do not effectuate a seizure merely by asking questions unless the circumstances of the encounter are sufficiently intimidating that a reasonable person would believe that he was not free to turn his back on his interrogator and walk away." *Commonwealth* v. *Barros, supra* at 174. Here, considering all the circumstances, the motion judge was correct in determining that the defendant was "seized" by the police when, after the three officers converged on him on Emerson Street, Trooper Watson asked the defendant to "come over here." When three armed officers wearing "Gang Unit" shirts emerged from a single vehicle and pursued the defendant, continuing to close in on him even after he reversed direction to avoid them, a reasonable person would have believed that he was not free to ignore Trooper Watson's request that he "come over here" to answer their questions.[4] See *id.* at 175-176; *Commonwealth* v. *Stoute, supra* at 786, 789.

The question remains whether the Commonwealth has met its burden of establishing that, at the time Trooper Watson called to the defendant, the stop was justified by reasonable suspicion, based on specific and articulable facts, that the defendant had committed, was committing, or was about to commit a crime. See *Commonwealth* v. *DePeiza,* 449 Mass. 367, 369-371 (2007). See also *Terry* v. *Ohio,* 392 U.S. 1, 21 (1968). Absent such a justification, the stop was unlawful, and the gun recovered by the police should have been suppressed as the fruit of an unlawful seizure. See *Commonwealth* v. *Loughlin,* 385 Mass. 60, 63 (1982); *Commonwealth* v. *Ferrara,* 376 Mass. 502, 505 (1978).

---

[4]Under the Fourth Amendment to the United States Constitution, a seizure does not occur until the police lay on hands or apply physical force to restrain the suspect's movement, or until the suspect submits to the assertion of authority. See *California* v. *Hodari D.,* 499 U.S. 621, 629 (1991). Consequently, in this case, the seizure of the defendant for Fourth Amendment purposes did not occur until after the firearm fell to the sidewalk.

When police officers on the street stop a defendant in reliance on a police dispatch alone, the stop is lawful only if the Commonwealth establishes both that the information on which the dispatch was based had sufficient indicia of reliability, and that the description of the suspect conveyed by the dispatch had sufficient particularity that it was reasonable for the police to suspect a person matching that description. See *Commonwealth* v. *Lopes*, 455 Mass. 147, 155 (2009). See also *Commonwealth* v. *Riggieri*, 438 Mass. 613, 615-616 (2003); *Commonwealth* v. *Mercado*, 422 Mass. 367, 370-371 (1996). "To establish that the transmitted information bears adequate indicia of reliability, the Commonwealth must show the basis of knowledge of the source of the information (the basis of knowledge test) and the underlying circumstances demonstrating that the source of the information was credible or the information reliable (veracity test)." *Commonwealth* v. *Lopes*, *supra* at 155-156. See *Commonwealth* v. *Upton*, 394 Mass. 363, 374-375 (1985). "Because the standard is reasonable suspicion rather than probable cause, a less rigorous showing in each of these areas is permissible." *Commonwealth* v. *Lyons*, 409 Mass. 16, 19 (1990). "Independent police corroboration may make up for deficiencies in one or both of these factors." *Commonwealth* v. *Riggieri*, *supra* at 615-616, quoting *Commonwealth* v. *Barros*, *supra* at 176.

The tape recording of the 911 call was in evidence at the motion to suppress hearing and was reviewed by the motion judge. From our own review of the recording, we conclude that the judge did not err in finding that the information provided by the caller was based on her personal observation. The caller reported that she heard gunshots, looked out into the back yard, and saw the individual she described fleeing the scene of the shooting. An eyewitness's report to police of her recent, firsthand observation satisfies the basis of knowledge prong. See *Commonwealth* v. *Alfonso A.*, 438 Mass. 372, 374 (2003); *Commonwealth* v. *Alvarado*, 423 Mass. 266, 271 (1996).

As to the veracity test, our case law assigns greater reliability to an eyewitness whose identity is known to police than to one who is anonymous. See *Commonwealth* v. *Costa*, 448 Mass. 510, 514-515 (2007). In all but the most extraordinary circumstances, the Commonwealth will be unable to demonstrate that an anonymous source has a prior history of providing accurate

information or, because of her reputation or other personal circumstance, is worthy of belief. An anonymous source also need not fear the consequences of knowingly providing false information.[5] However, where the source is anonymous, the Commonwealth may still be able to demonstrate reliability by showing that the details of the information provided were corroborated by police observation or investigation. See *Commonwealth* v. *Lyons, supra* at 19; *Commonwealth* v. *Campbell*, 69 Mass. App. Ct. 212, 216 (2007). Here, however, the details the anonymous caller provided were so general (white shirt, blue shorts, hat) that it is not fair to conclude that her report was reliable simply because police observed an individual wearing those clothes (but not the hat) within two or three blocks of the shooting; on a summer's night in any city, the police can expect to find someone wearing such clothing within virtually any two- to three-block radius.

Corroboration, however, is not the only way the Commonwealth can establish the reliability of an anonymous caller. Under our common law of evidence, we have recognized that a statement may be sufficiently reliable to be admitted in evidence as an exception to the hearsay rule where it is made in reaction to a startling or shocking event if its utterance was "spontaneous to a degree which reasonably negated premeditation or possible fabrication and if it [tends] to qualify, characterize and explain the underlying event." *Commonwealth* v. *DiMonte*, 427 Mass. 233, 236 (1998), quoting *Commonwealth* v. *Crawford*, 417 Mass. 358, 362 (1994). See *Commonwealth* v. *Santiago*, 437 Mass. 620, 623 (2002). See also Mass. G. Evid. § 803(2) (2008-2009). It is not a requirement of admissibility that the declarant be an actual participant in the startling event, as long

---

[5] "We have also suggested that the reliability of citizen informants who are identifiable, but may not have been identified, is deserving of greater consideration than that of truly anonymous sources." *Commonwealth* v. *Costa*, 448 Mass. 510, 515 (2007). Here, the record is silent as to whether the New Bedford police emergency line on July 24, 2007, used a caller identification system that would have identified the telephone number from which the call was made, or whether the caller otherwise believed that her identity could have been learned by the police. In the absence of such evidence, we cannot conclude that the caller had any reason to believe that she could be held responsible for providing information she knew to be false. Compare with *id.* at 512 (911 emergency operator informed anonymous caller that call was being recorded and that operator had caller's cellular telephone number).

as the declarant has personal knowledge of the event. *Commonwealth* v. *Harbin*, 435 Mass. 654, 657 (2002). "[A] bystander's declarations would be admissible." *Id.*, quoting 6 J. Wigmore, Evidence § 1751, at 222-223 (1976).

We need not decide whether this anonymous declarant's telephone call to the police would be admissible in evidence at trial as an excited utterance (or whether its admission in that context would satisfy the confrontation clause of the Sixth Amendment to the United States Constitution, see *Commonwealth* v. *Burgess*, 450 Mass. 422, 426-430 [2008]) to decide that the excited nature of this telephone call supports the reliability of the caller by "reasonably negat[ing] premeditation or possible fabrication." See *Commonwealth* v. *DiMonte, supra.* The caller certainly could have been in error, although she said that the shooting occurred in "her back yard" and that from her window she could see a person fleeing the scene of the shooting, but the circumstances of her report give no reason to fear that she intended to mislead the police. Indeed, if the caller had intended for some malicious purpose to point the police in the direction of an innocent person, it seems likely she would have provided a more detailed description of the person fleeing (and that she would have claimed to have seen a firearm in his hand). The anonymous caller's information passes the veracity test for the same reasons an excited utterance is deemed sufficiently reliable to be admitted in evidence as an exception to the rule against hearsay.

The fact that the caller's report satisfies both the basis of knowledge test and the veracity test means that the information transmitted by the dispatcher to the officers bore sufficient indicia of reliability that the officers were entitled to rely on the dispatch in conducting their investigation. It does not necessarily mean, however, that the description of the suspect transmitted by the police dispatcher was sufficiently detailed and particularized that it was reasonable for the police to stop any person matching that description. See *Commonwealth* v. *Lopes*, 455 Mass. 147, 157 (2009); *Commonwealth* v. *Riggins*, 366 Mass. 81, 87 (1974). To make an investigatory stop based solely on a physical description, the description need not be so particularized as to fit only a single person, but it cannot be so general that it would include a large number of people in the

area where the stop occurs. Compare *Commonwealth* v. *Lopes,* *supra* at 154, 157-158 (broadcast directing police to be on lookout for brown van with tinted windows and Cape Verdean flag in back sufficiently particularized to support reasonable suspicion for vehicle stop), with *Commonwealth* v. *Cheek,* 413 Mass. 492, 496 (1992) (description of suspect as "black male with a black ³/₄ length goose" jacket not sufficiently particularized to support reasonable suspicion for stop). The description given here of a person wearing a white shirt and blue shorts might have eliminated many people walking in the immediate area of the shooting, but it was plainly not singular; the record shows that it fit at least three men observed by the officers as they drove the streets surrounding the United Front project immediately following the shooting.

There are three accompanying circumstances that must be considered together with the dispatcher's description in determining whether the police had reasonable suspicion to stop the defendant. See *Commonwealth* v. *Mercado,* 422 Mass. 367, 371 (1996). See also *Commonwealth* v. *Doocey,* 56 Mass. App. Ct. 550, 557 (2002). First, the defendant, approximately ten minutes after the report of the shooting, was seen within three blocks of the crime scene, and he was moving away from the area of the shooting. Compare *Commonwealth* v. *Riggins, supra* at 83, 87 (radio broadcast that two males in red vehicle were heading south on Route 83 after committing bank robbery in East Longmeadow provided sufficient detail that vehicle stopped might have been involved in robbery when stop occurred on Route I-91 at time consistent with travel time from scene of robbery), with *Commonwealth* v. *Cheek, supra* (insufficient detail in generalized description of suspect to justify stop where defendant was observed walking on street approximately one-half mile from scene of reported stabbing, but there was no indication he was fleeing crime scene or had engaged in criminal activity).

Second, when the officers approached the defendant, before Trooper Watson called out to him, the defendant reversed direction and began to move away from the officers. See *Commonwealth* v. *Stoute,* 422 Mass. 782, 791 (1996) (defendant's "accelerated pace" as he drew away from officers could contribute to suspicion); *Commonwealth* v. *Mercado, supra* at 368, 371 (suspects' retreat

into store after seeing officers may be considered in evaluating reasonable suspicion).

Third, the officers were looking for someone who may have shot another person a few blocks away approximately ten minutes earlier. The gravity of the crime and the present danger of the circumstances may be considered in the reasonable suspicion calculus. See *Commonwealth* v. *Lopes, supra* at 157-159 (report that van had been involved in homicide may be considered in evaluating whether police had reasonable suspicion to stop van meeting dispatcher's description); *Commonwealth* v. *Campbell,* 69 Mass. App. Ct. 212, 216-217 (2007), and cases cited (immediate danger to public safety may be considered in determining reasonableness of stop); *Commonwealth* v. *Doocey, supra* at 557 (in circumstances where gun presents "imminent threat" because of shots just fired, or likely to be fired, "there is an edge added to the calculus upon which . . . reasonable suspicion may be determined").

We conclude that the police had reasonable suspicion to justify an investigatory stop of the defendant. Physical proximity, closeness in time, the defendant's obvious effort to avoid encountering the police, and the danger to public safety supplemented the less than distinctive physical description relayed in the police dispatch. Taking these elements together, we conclude that, at the time of the *Terry* stop, the police officers had a reasonable suspicion that the defendant had been involved in the shooting. See *Commonwealth* v. *Mercado, supra*; *Commonwealth* v. *Doocey, supra.* Because the stop was lawful, the defendant's motion to suppress the handgun recovered by the police after the stop was properly denied.

2. *Admission of ballistics certificate.* At trial, the Commonwealth offered in evidence a certificate of examination signed by Trooper John H. Conroy, III, of the State police firearms identification section, in which he attested that the revolver and live cartridges submitted to him were, respectively, a firearm and ammunition as defined in G. L. c. 140, § 121.[6] The certification was offered through the testimony of Sergeant Troy C. Spirlet of the New Bedford police department, the commander

---

[6]The crime of unlawfully carrying a firearm or a loaded firearm under G. L. c. 269, § 10 (*a*) and (*n*), incorporates the definition of a "firearm" and "ammunition" under G. L. c. 140, § 121.

of its firearms division; Trooper Conroy did not testify at trial. Defense counsel objected to the admission of the certificate, but the objection was overruled and the certificate was admitted in evidence.

Following the defendant's conviction, the United States Supreme Court in *Melendez-Diaz* v. *Massachusetts,* 129 S. Ct. 2527, 2532 (2009) (*Melendez-Diaz*), held that, in the absence of stipulation, the confrontation clause of the Sixth Amendment prohibits the admission of a State laboratory certificate of analysis as evidence against the accused unless the accused has the opportunity to cross-examine the analyst who attested to the laboratory results. The *Melendez-Diaz* decision effectively overruled our decision in *Commonwealth* v. *Verde,* 444 Mass. 279, 280 (2005), in which we held that a drug certificate issued by a crime laboratory is "akin to a business record" and therefore does not implicate the confrontation clause. See *Melendez-Diaz, supra* at 2542. While the certificate at issue in the Supreme Court's *Melendez-Diaz* decision reported the weight of suspected narcotics and declared that the substance tested contained cocaine, *id.* at 2531, we recognize that the holding of that decision applies equally to the certificate at issue in this case, which certified that the revolver found near the defendant at the time of his arrest was a firearm from which a bullet could be discharged and that the ammunition was designed for use in a firearm.[7] See *Morales* v. *Massachusetts,* 129 S. Ct. 2858 (2009) (vacating firearms convictions where ballistics certificate was admitted over defense objection, and remanding to Appeals Court "for further consideration in light of [*Melendez-Diaz*]").

Because the defendant objected to the admission of the certificate and because its admission over objection constituted constitutional error, we must now determine whether the erroneous admission of the certificate was "harmless beyond a reasonable doubt." *Chapman* v. *California,* 386 U.S. 18, 24 (1967).[8]

---

[7]Under G. L. c. 140, § 121, the statute referenced in the certificate, a "firearm" is defined as "a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches." "Ammunition" is defined as "cartridges or cartridge cases, primers (igniter), bullets or propellant powder designed for use in any firearm, rifle or shotgun."

[8]In objecting to the admission of the certificate, defense counsel did not

See *Commonwealth* v. *Tyree*, 455 Mass. 676, 700-701 (2010). The burden of showing that the error was harmless beyond a reasonable doubt rests with the Commonwealth. *Id.* at 701. In determining whether the error is harmless, we do not ask whether the evidence was sufficient to convict the defendant without the erroneously admitted certificate, but "whether, on the totality of the record before us, weighing the properly admitted and the improperly admitted evidence together, we are satisfied beyond a reasonable doubt that the tainted evidence did not have an effect on the jury and did not contribute to the jury's verdicts." *Id.* Applying that rigorous standard, we conclude that the error in this case was harmless beyond a reasonable doubt because the lawfully admitted evidence that the revolver was a working firearm and that the ammunition was designed for use in a firearm was so overwhelming as to "nullify any effect [the erroneously admitted evidence] might have had on the jury or the verdict." *Id.* at 704 n.44, quoting *Commonwealth* v. *Dagraca*, 447 Mass. 546, 555 (2006).

At trial, Trooper Cyr testified that, after the officers' arrest of the defendant, they left the handgun on the sidewalk to be photographed and retrieved by New Bedford police officers responsible for crime scene investigation. Officer Claudia Sampson testified that she photographed the handgun at the scene of the defendant's arrest, placed the gun in a gun box, and transported it to a

---

mention the confrontation clause or cite *Crawford* v. *Washington*, 541 U.S. 36, 54 (2004), the seminal United States Supreme Court case holding that, under the confrontation clause, a witness's testimonial statement is inadmissible in a criminal trial unless the witness appears at trial or the defendant had a prior opportunity for cross-examination. Nor did defense counsel inform the judge that the United States Supreme Court had granted certiorari in *Melendez-Diaz* v. *Massachusetts* on March 17, 2008, five months before the trial. 552 U.S. 1256 (2008). Instead, defense counsel argued that "we don't have any evidence of what occurred once [the firearm] goes into the hands of the State police . . . . It's a facial certification, but we have no background on it." We conclude that this objection gave fair notice to the judge that defense counsel was objecting to the admission of the certificate on the ground that he had no opportunity to cross-examine the trooper issuing the certification as to how the certification was made. We look to the substance of defense counsel's objection rather than his use of specific language, terms, or phrases in determining whether the objection preserves the issue for appeal. See *Commonwealth* v. *Mattei*, 455 Mass. 840, 846-847 n.13 (2010); *Commonwealth* v. *Cancel*, 394 Mass. 567, 574 (1985); *Commonwealth* v. *Monteiro*, 51 Mass. App. Ct. 552, 559-560 (2001). The objection, therefore, was adequately preserved.

locked cabinet at the police station. The following day, she turned the gun box over to Sergeant Spirlet, who inspected the handgun. He testified that the firearm recovered by police was a revolver and identified the gun produced at trial as the same he had inspected. He testified that, when he inspected it, the revolver was loaded with four live rounds of .22 caliber ammunition and one spent casing. He distinguished the latter by explaining that, in contrast to the live rounds, the spent round had no projectile inside its casing; additionally, in contrast to a live round, a spent casing bears an imprint or "striker mark" left when the hammer of the gun strikes the bullet's casing to fire the weapon, whereas a live round carries no such mark. Sergeant Spirlet testified that, after his inspection, the gun box with the revolver, the live rounds, and the spent casing were sent to the State police barracks in Middleborough for processing. When he later received the gun box from the State police, it contained the revolver, three spent projectiles and their casings, and only one live round; he testified, without objection, that the three additional spent projectiles had been test fired.

While it is conceivable that a revolver may contain a spent casing and still not be capable of discharging a bullet, the compelling inference from such testimony is that the spent casing found by Sergeant Spirlet in the revolver remained after the discharge of a bullet from that revolver.[9] The remote possibility of some other explanation for the presence of the spent casing in the revolver was effectively eliminated by the evidence that three of the live rounds sent to the State police were returned as spent projectiles. On this testimony, the jury could reasonably infer that the State police had test fired the revolver using the live rounds. In view of this evidence, we are satisfied beyond a reasonable doubt that, even without the certificate, the evidence that the revolver was a working firearm and that the ammunition was designed for use in the firearm was overwhelming, and that the erroneous admission of the certificate did not in any

---

[9]The jury could not reasonably have inferred, however, that the bullet had been discharged from the revolver in the shooting that preceded the defendant's arrest because, at trial, the jury did not learn of the shooting. The jury instead were told by the judge that they "should not consider . . . why the defendant may have been approached" by Trooper Cyr prior to his arrest. Therefore, we do not consider such an inference in determining whether the erroneous admission of the certificate was harmless beyond a reasonable doubt.

way affect the jury's verdict. As a result, we conclude that the error in this case was harmless beyond a reasonable doubt.

3. *The defendant's Second Amendment claim.* In his final challenge to the verdicts, the defendant, citing *District of Columbia* v. *Heller*, 128 S. Ct. 2783 (2008) (*Heller*), argues that, even if he violated the prohibitions of G. L. c. 269, § 10 (*a*) and (*n*), by carrying a loaded firearm without a license to carry, his convictions must be reversed because the statutory scheme requiring a license to carry a firearm impermissibly infringed his individual, constitutional right to keep and bear arms under the Second Amendment to the United States Constitution.[10] In *Heller*, the Supreme Court held that the District of Columbia's "ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." *Id.* at 2821-2822. In doing so, the Supreme Court announced for the first time that the Second Amendment protects a limited, individual right to keep and bear firearms for the purpose of self-defense, not simply a collective right to possess and carry arms for the purpose of maintaining a State militia. See *id.* at 2799.[11]

The defendant asserts that, because G. L. c. 140, § 131, requires a person to obtain a license before he may carry a handgun, the statutory scheme operates as a prior restraint that impermissibly interferes with the exercise of his Second Amendment right to bear arms. Therefore, he argues, his convictions under G. L. c. 269, § 10 (*a*) and (*n*), which punish him for carrying a firearm in noncompliance with the license requirement, must be overturned as unconstitutional.

The defendant's argument rests on the assumption that the protection of the Second Amendment applies to the States as a matter of substantive due process under the Fourteenth Amend-

---

[10]General Laws c. 269, § 10 (*a*), makes it an offense to possess a firearm outside of one's residence or place of business without also having a license to carry firearms that has been issued under the licensing provisions of G. L. c. 140, § 131. General Laws c. 269, § 10 (*n*), provides for an enhanced sentence when the violation of G. L. c. 269, § 10 (*a*), is committed with a loaded firearm.

[11]The Second Amendment to the United States Constitution provides: "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed."

ment to the United States Constitution. For the reasons stated in *Commonwealth* v. *Runyan, ante* 230 (2010), we conclude that, based on current Federal law, the Second Amendment does not apply to the States, either through the Fourteenth Amendment's guarantee of substantive due process or otherwise. Because the Second Amendment does not apply to the States, the defendant's claim that G. L. c. 269, § 10 (*a*) and (*n*), and the licensing scheme the statute enforces, infringe on his Second Amendment right to keep and bear arms must fail.

The defendant's challenge likewise fails under our Massachusetts Constitution, which recognizes no individual right to keep and bear arms. Article 17 of the Massachusetts Declaration of Rights provides: "The people have a right to keep and to bear arms for the common defence. And as, in time of peace, armies are dangerous to liberty, they ought not to be maintained without the consent of the legislature; and the military power shall always be held in an exact subordination to the civil authority, and be governed by it." In *Commonwealth* v. *Davis,* 369 Mass. 886, 888 (1976), we concluded that G. L. c. 269, § 10, did not violate the Massachusetts Constitution because art. 17 was intended to provide for the common defense and does not guarantee an individual right to keep and bear arms. We further stated that the statute was "part of a large regulatory scheme to promote the public safety, and there is nothing to suggest that, even in early times, due regulation of possession or carrying of firearms, short of some sweeping prohibition, would have been thought to be an improper curtailment of individual liberty or to undercut the militia system" (footnotes omitted).[12] *Id.* See *Commonwealth* v. *Murphy,* 166 Mass. 171, 172 (1896) (notwithstand-

___

[12]In *District of Columbia* v. *Heller,* 128 S. Ct. 2783, 2803 (2008), the Supreme Court, without citing *Commonwealth* v. *Davis,* 369 Mass. 886, 888-889 (1976), declared that the "most likely reading" of art. 17 of the Massachusetts Declaration of Rights, which preceded the adoption of the Second Amendment to the United States Constitution, is that it "secured an individual right to bear arms for defensive purposes." As we discuss above, in the *Davis* decision, where the question was directly raised, we did not read art. 17 to secure an individual right to bear arms. *Commonwealth* v. *Davis, supra* at 888 ("Provisions like art. 17 were not directed to guaranteeing individual ownership or possession of weapons"). Nothing in the Supreme Court's opinion in *Heller* causes us to question Justice Kaplan's learned interpretation of art. 17 in *Commonwealth* v. *Davis, supra.*

ing art. 17, it is within police powers of Legislature to regulate bearing of arms); *Chief of Police of Shelburne* v. *Moyer*, 16 Mass. App. Ct. 543, 547 (1983) ("There is no right under art. 17 of the Declaration of Rights of the Massachusetts Constitution for a private citizen to keep and bear arms . . .").

*Judgments affirmed.*