NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

14-P-1400                                    Appeals Court

COMMONWEALTH  vs.  CAJOU JOHNSON.


No. 14-P-1400.

Essex.     September 14, 2015. - December 9, 2015.

Present:  Green, Wolohojian, & Hanlon, JJ.


Firearms.  Practice, Criminal, Motion to suppress, Findings by
    judge.  Constitutional Law, Search and seizure,
    Investigatory stop, Reasonable suspicion.  Search and
    Seizure, Reasonable suspicion, Clothing.



Indictments found and returned in the Superior Court
Department on November 8, 2012.

A pretrial motion to suppress evidence was heard by Timothy
Q. Feeley, J, and the cases were heard by Howard J. Whitehead,
J.


Patrick Levin for the defendant.
Philip Anthony Mallard, Assistant District Attorney, for
the Commonwealth.


WOLOHOJIAN, J.  At issue is whether there was reasonable

suspicion to stop and frisk the defendant, who did not match the

particularized aspects of the descriptions provided by

eyewitnesses who called 911 to report that there had been a

shoot-out on a residential street. The defendant was, however, among the trees in a closed public park well after dark, close to the scene of the crime within minutes of its occurrence, wearing a "hoodie" pulled tightly around his face. In the circumstances presented, as described more fully below, we conclude that the seizure was reasonable and therefore there was no error in the denial of the defendant's motion to suppress.[1]

Background. We recite the facts as found by the motion judge.

"On October 19, 2012, the [Lynn police department (LPD)] received eight 911 calls within a four minute span of time, starting at 10:09 pm. Each of the calls related to a 'shots fired' incident on Harwood Street. Several reported hearing the shots fired, but reported no observations of the actual shooting. Those calls could not pinpoint the exact location of the shooting. As many as twelve discharges were reported, involving at least two different weapons. A caller from Harwood Street reported seeing people shooting on that street. He reported the people to include black and/or Spanish, with a shooter observed to run toward Common Street. A caller from 82 Harwood Street reported guys in her backyard shooting guns, but it appeared that her neighbor had actually made the observations. Another caller reported observing shots fired at 66 Harwood Street. He observed the shooter as being a black male, wearing a black jacket and red bandana, shooting at another black male, and then running toward Western Avenue.

"The first LPD dispatch occurred at 10:09 pm, reporting two reports of shots fired in the Whiting/Harwood

_____

[1] After a bench trial, the defendant was convicted of carrying a firearm without a license, as a second offense, and carrying a loaded firearm. He was sentenced to five to six years in prison, followed by three years' probation. The only issue raised in this direct appeal is the denial of his motion to suppress.

Streets area.  At 10:10 pm, dispatch reported a black male, wearing a black jacket, and red bandana, heading toward Western Avenue from Harwood.  At 10:12 pm, Officer James McIntyre ('McIntyre') in Car 8 reported himself to be driving along the Commons.  Shortly thereafter, and before 10:14 pm, McIntyre reported he had a party with a gun, and gave his location as the Commons near 170 South Commons.

"McIntyre is a twenty-eight year veteran of the LPD. At 10:09 pm on October 19, 2012, he was on the Lynnway near the entrance to the GE plant.  He heard the first dispatch about shots fired in the area of Whiting/Harwood Streets, and immediately responded in that direction in his marked cruiser, Car 8.  He used his lights and siren to travel the couple of minutes it took to drive from the Lynnway to the Commons.  He deactivated his lights and siren as he arrived at the Commons and turned right onto South Commons.  He reported his location at the Commons to dispatch at 10:12, less than three full minutes from the first dispatch of shots fired.

"The Commons is a long narrow park area, somewhat in the shape of a fish.  It extends eight to ten blocks in length, and is bordered by North and South Common Streets. . . .  Harwood Street is one of many streets that runs perpendicular to and ends at North Common[] Street. . . . Although the center of the Commons is largely free of trees and shrubs, each end has numerous trees throughout the park area.  There is no artificial lighting within the Commons, and it can be very dark, particularly in the areas of the trees.

"McIntyre observed two females and a male, later identified as Gabriel Smith ('Smith'), inside the Commons. They were opposite 170 South Common[] Street.  McIntyre exited his police cruiser and approached the three individuals.  He directed Smith to place his hands on the top of his head, to which Smith responded with yelling and screaming.  Smith was later determined to be intoxicated and was arrested for disorderly conduct.  Although Smith looked to be either a black or Spanish man, McIntyre did not approach further or attempt to pat frisk him.  As McIntyre looked to his left, he saw the silhouette of a person walking away from him near the tree area of the Commons, within twenty-five feet of where he was standing. McIntyre used his flashlight to illuminate the individual, and saw him to be a black male, with a gray hoodie pulled

tightly around his face.  McIntyre saw the man's hands at his sides, and ordered him to place his hands on the top of his head.  The man did not comply until McIntyre repeated his order, and then unsnapped his holstered weapon.  After his hands were raised, McIntyre approached the man, later identified as [the defendant], and patted him down.  McIntyre felt an object he believed to be a handgun in [the defendant's] left front pocket.  McIntyre then controlled [the defendant] by means of an arm bar and reported to dispatch that he had a party with a gun on the Commons, near 170 South Common[] Street.  [The defendant] was not wearing a black jacket or a red bandana.  Dispatch received McIntyre's report just seconds before 10:13 pm, almost exactly three and one-half minutes after the first dispatch about the shots fired incident."

On these facts, the judge denied the defendant's motion to

suppress, and held that

"reasonable suspicion existed to conclude that [the defendant] was involved in the shots fired incident on Harwood Street and was armed and dangerous.  The court finds the following specific facts persuasive on the issue.  Only a very short time (less than three and one-half minutes) had passed from the multiple reports of shots fired on Harwood Street to McIntyre's observations of [the defendant].  [The defendant] was in a closed public park well after dark.  [The defendant's] presence among the trees was suggestive of trying to stay hidden from police observation, particularly with police lights and sirens in the area.  [The defendant's] hoodie was pulled tightly around his face, also suggestive of a desire to hide or disguise his facial features.  The Commons is only a short distance from Harwood Street, easily reached within the time frame established by the record.  [The defendant] is a black male, consistent with the most detailed of the eye witness descriptions.  A witness said the shooter fled toward Western Avenue, and [the defendant's] location at the far end of the Commons is consistent with leaving Harwood Street and heading through the Commons to Western Avenue."

The judge also stated in a footnote

"The fact that [the defendant] was not wearing a black jacket and red bandana does not negate or prevent

articulable suspicion from being present.  Outer clothing, such as a jacket and bandana, are easily discarded, and probably not uncommon when a person is fleeing a shots fired incident."

Discussion.  The defendant argues first that two of the judge's findings are clearly erroneous.  The Commonwealth concedes the point with respect to the finding that the defendant's location in the Commons was "consistent with leaving Harwood Street and heading through the Commons to Western Avenue."  Indeed, the evidence (which included a map of the area) admitted during the suppression hearing showed that Western Avenue is located on one end of Harwood Street and the Commons is located on the other.[2]

The Commonwealth does not concede that the judge's finding that a caller from Harwood Street reported that the shooters were "people to include black and/or Spanish" was clearly erroneous.  However, the Commonwealth acknowledges that, because this finding is based entirely on the contents of a recording of

_____

[2] The defendant moved for reconsideration based on the erroneous finding.  That motion was denied, and the judge's margin endorsement states that

"the direction of travel is only one of several factors relied on by the court -- and from the lower end of Harwood St., the far end of the Commons is consistent with heading toward Western Ave. -- the court did not say or find it was the most direct path or only path to Western Avenue."

In fact, there was no evidence that the defendant was at the "far end of the Commons."  Instead, Officer McIntyre placed the defendant opposite 170 South Common Street, and he indicated the location on the map that was admitted in evidence.

a 911 call, our review is independent and de novo.  Commonwealth v. Thomas, 469 Mass. 531, 539 (2014).  We have listened to the recordings of the 911 calls, as well as the dispatch recordings.  In fact, no single caller reported that the shooters were "black and/or Spanish."  The caller on Harwood Street to which the judge's finding apparently relates reported that there were multiple shooters and that they were Spanish and running towards the Commons.  That caller did not report seeing anyone black.  However, another caller did report seeing a black man "shooting at another black gentleman."

Excluding those two erroneous findings from our consideration, but adopting the remaining findings, we turn to "independently determin[ing] whether the judge correctly applied constitutional principles to the facts as found."  Commonwealth v. Isaiah I., 450 Mass. 818, 821 (2008).

"Pursuant to the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, a 'seizure' occurs when, 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'  United States v. Mendenhall, 446 U.S. 544, 554 (1980).  See Commonwealth v. Stoute, 422 Mass. 782, 785-789 (1996) (adopting Mendenhall standard for purposes of art. 14).  If a suspect was seized in the constitutional sense, we ask whether the stop was

based on an officer's reasonable suspicion that the person was committing, had committed, or was about to commit a crime. Commonwealth v. Wilson, 441 Mass. 390, 394 (2004), citing Commonwealth v. Silva, 366 Mass. 402, 405 (1974)." Commonwealth v. Martin, 467 Mass. 291, 302-303 (2014). Here, that question is whether, at the moment when he ordered the defendant to put his hands on his head, Officer McIntyre had a reasonable suspicion that the defendant had been involved in the shootings on Harwood Street.[3,4] That suspicion had to be based on objective, specific, and articulable facts. See Commonwealth v. Sykes, 449 Mass. 308, 314 (2007), quoting from Commonwealth v. Grandison, 433 Mass. 135, 139 (2001) ("Reasonable suspicion may not be based on good faith or a hunch, but on specific,

---

[3] Neither party challenges the judge's conclusion that the defendant was seized in a constitutional sense when Officer McIntyre ordered him to place his hands on his head. Nor does the defendant challenge the reasonableness of the patfrisk. His challenge is limited to the reasonableness of the stop. See Commonwealth v. Narcisse, 457 Mass. 1, 6-7 (2010) (stop and frisk must be independently analyzed, even if facts relevant to each occur almost simultaneously).

[4] The Commonwealth also argues (as it did in the trial court) that Office McIntyre had a reasonable suspicion that the defendant was committing a criminal trespass in the park, which was closed after dark. The motion judge did not consider this alternate ground, nor did he make any of the findings that would be necessary (such as whether notice of the park's closure and its consequences was posted and, if so, where). We, therefore, do not consider this alternate theory, nor is it necessary to our decision.

articulable facts and inferences that follow from the officer's experience. . . . The test is an objective one").

Where, as here, "police officers on the street stop a defendant in reliance on a police dispatch alone, the stop is lawful only if the Commonwealth establishes both that the information on which the dispatch was based had sufficient indicia of reliability, and that the description of the suspect conveyed by the dispatch had sufficient particularity that it was reasonable for the police to suspect a person matching that description." Commonwealth v. Depina, 456 Mass. 238, 243 (2010). See Commonwealth v. Mubdi, 456 Mass. 385, 395 (2010). The defendant does not challenge the veracity or reliability of the 911 callers. And, indeed, having listened to the tape recordings of the 911 calls, we conclude there would have been no basis for him to have done so with respect to the two callers who provided descriptions of the shooters, even though both callers were anonymous. Both callers were eyewitnesses, contemporaneously reporting their firsthand observations of an ongoing crime, and the details and circumstances of their reports provided sufficient indicia of the callers' reliability. See generally Commonwealth v. Depina, supra at 243-244.

But the particularity of the callers' descriptions is a separate question. "To make an investigatory stop based solely on a physical description, the description need not be so

particularized as to fit only a single person, but it cannot be so general that it would include a large number of people in the area where the stop occurs." Id. at 245-246. Here, one caller described the shooters as "Spanish," with nothing more. Another caller described the shooter as "black," also with no further detail. Neither of these descriptions was sufficiently particularized to support reasonable suspicion. See Commonwealth v. Cheek, 413 Mass. 492, 496 (1992) (description of suspect as "black male with a black 3/4 length goose" jacket not sufficiently particularized to support reasonable suspicion). Another caller described the shooter as a black man wearing a black jacket and a red bandana who went in the direction of Western Avenue. Regardless of whether this is a sufficiently particularized description, it could not support reasonable suspicion in this case because the defendant did not match it except with respect to his race. He wore neither a black jacket nor a red bandana, and he was stopped in a location opposite the direction of Western Avenue. As the officer himself candidly admitted when questioned by the judge at the suppression hearing, nothing connected the defendant to the shooting other than being a black or Hispanic male.[5]

---

[5] The court: "What, if anything, did you observe, Officer, that connected the man by the trees to the shooting reported by dispatch?"

That said, in the immediate aftermath of a shooting, even where there is no particularized description of the suspect, the police may nonetheless stop someone when circumstances make the seizure reasonable under the Fourth Amendment and art. 14. See Commonwealth v. Depina, 456 Mass. at 247 ("The gravity of the crime and the present danger of the circumstances may be considered in the reasonable suspicion calculus"). See also Commonwealth v. Grant, 57 Mass. App. Ct. 334, 339 (2003). Such circumstances exist here. The police had several reliable reports of a gunfight at night on a residential street, involving multiple people fleeing on foot in separate directions. At least one person was wounded. The immediacy of the gunfight, its occurrence in a residential neighborhood, and the participation by multiple shooters who dispersed in different directions made this a public safety emergency. One group involved in the shootings was reported to have fled in the direction of the Commons, a public park that, at that time of night, was closed. The defendant was observed in the Commons three and one-half minutes after the shootings, not far from Harwood Street. The defendant's position and clothes suggested a desire to conceal himself: he was standing among the trees in the unlit interior of the park, wearing a hoodie "tightly"

The witness: "Other than being a black or Hispanic male, nothing really. Just stood out. No bandana or nothing like that."

pulled around his face.  In these circumstances, Officer McIntyre had a reasonable suspicion to justify an investigatory stop of the defendant.  "Physical proximity, closeness in time, the defendant's [efforts to conceal himself], and the danger to public safety supplemented the less than distinctive physical description relayed in the police dispatch.  Taking these elements together, we conclude that, at the time of the Terry stop [see Terry v. Ohio, 392 U.S. 1 (1968)], [Officer McIntyre] had a reasonable suspicion that the defendant had been involved in the shooting."  Commonwealth v. Depina, 456 Mass. at 247. See Commonwealth v. Stoute, 422 Mass. at 791, quoting from United States v. Bold, 19 F.3d 99, 104 (2d Cir. 1994) ("test for determining reasonable suspicion should include consideration of the possibility of the possession of a gun, and the government's need for prompt investigation").  Accordingly, the judge did not err in denying the defendant's motion to suppress.

Judgments affirmed.