## COMMONWEALTH *vs.* ERIC ANDERSON.

Suffolk. December 6, 2011. - March 9, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Practice, Criminal,* Motion to suppress, Duplicative convictions, Lesser included offense. *Constitutional Law,* Search and seizure, Investigatory stop, Reasonable suspicion. *Search and Seizure,* Reasonable suspicion. *Firearms. Youthful Offender Act. Delinquent Child. Robbery. Assault by Means of a Dangerous Weapon. Words,* "Violent crime."

A Superior Court judge did not err in denying a criminal defendant's pretrial motion to suppress evidence of the fruits of a stop and subsequent search of a vehicle in which the defendant was a passenger, where the stop of the vehicle was supported by reasonable suspicion, given that the dispatch on which the police relied in making the stop contained sufficient particularity in describing the vehicle and its occupants and bore adequate indicia of its reliability (i.e., an anonymous report of a recent, firsthand observation, made immediately after a startling event, with independent corroboration by police); and where the search of the vehicle for weapons was a permissible "frisk" of the vehicle during an investigative stop. [621-626]

A Superior Court judge erred in allowing a criminal defendant's youthful offender adjudication for carjacking to be used as one of the three prior adjudications of a violent crime or a serious drug offense necessary to find him an armed career criminal, level three, under G. L. c. 269, § 10G (c), where the carjacking did not involve the use or possession of a deadly weapon. [626-632]

A criminal defendant's conviction of assault by means of a dangerous weapon was not duplicative of his conviction of armed robbery, given that each offense had a required element that the other offense did not possess. [632-634]

INDICTMENT found and returned in the Superior Court Department on August 7, 2008.

A pretrial motion to suppress evidence was heard by *Charles J. Hely,* J., and the case was tried before *Charles T. Spurlock,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Kathryn Karczewska Ohren* (*Joe Griffin* with her) for the defendant.

*Kathleen Celio,* Assistant District Attorney, for the Commonwealth.

*Rose King, Wendy Wolf, & Erica Cushna,* for Youth Advocacy Department of the Committee for Public Counsel Services, amicus curiae, submitted a brief.

GANTS, J. On the afternoon of June 19, 2008, two men, each wearing a bandana around his face, entered a family-owned market in the Dorchester section of Boston. One man placed a revolver on the counter, with a round in the chamber directly behind the barrel, and demanded that the store clerk hand over "the money from the cash register and the lottery." The store clerk gave them the money, change from his pocket, and six packs of cigarettes, and the two men fled from the store.

On October 19, 2009, a jury in the Superior Court concluded that Eric Anderson was one of the two men who had robbed the clerk, finding the defendant guilty of armed robbery while masked in violation of G. L. c. 265, § 17; assault by means of a dangerous weapon in violation of G. L. c. 265, § 15B; carrying a firearm without a license in violation of G. L. c. 269, § 10 (*a*); possessing ammunition without a firearms identification card in violation of G. L. c. 269, § 10 (*h*); carrying a loaded firearm in violation of G. L. c. 269, § 10(*n*); and possessing a firearm during the commission of a felony in violation of G. L. c. 265, § 18B. After the defendant was found guilty of carrying an unlicensed firearm, and after the Commonwealth offered evidence that the defendant had been convicted as an adult of distribution and possession with intent to distribute of a class B substance, in violation of G. L. c. 94C, § 32A, and had youthful offender convictions of assault and battery by means of a dangerous weapon, in violation of G. L. c. 265, § 15B, and carjacking in violation of G. L. c. 265, § 21A, the jury found that the defendant was an armed career criminal, level three, in violation of G. L. c. 269, § 10G (*c*), and therefore subject to a mandatory minimum prison sentence of fifteen years for his illegal carrying of a firearm.[1]

---

[1] The defendant was sentenced as an armed career criminal to serve from fifteen years to fifteen years and one day in State prison for carrying a firearm without a license. He was sentenced to the same term for armed robbery while masked, to run concurrently with the armed career criminal sentence. The defendant was also sentenced to terms of from five years to five years and a day in State prison for assault by means of a dangerous weapon and for possessing a firearm during the commission of a felony, with each sentence to

The defendant appealed, and we transferred the case to this court on our own motion. On appeal he argues (1) that the motion judge (who was not the trial judge) erred in denying his motion to suppress; (2) the trial judge erred in allowing the defendant's youthful offender adjudication for carjacking to be used as one of the three prior adjudications of a violent crime or a serious drug offense necessary to find him an armed career criminal, level three; (3) his conviction of assault by means of a dangerous weapon was duplicative of his conviction of armed robbery while masked; and (4) his conviction of unlawful possession of ammunition was duplicative of his conviction of carrying a loaded firearm. We conclude that the motion judge did not err in denying the motion to suppress, but that the trial judge erred in allowing the youthful offender adjudication of carjacking to be used as a predicate offense in finding the defendant an armed career criminal, level three, under G. L. c. 269, § 10G (*c*). We also conclude that the defendant's convictions of assault by means of a dangerous weapon and armed robbery while masked are not duplicative, but that the defendant's conviction of the unlawful possession of ammunition must be vacated where the defendant has been convicted of carrying a loaded firearm.[2]

1. *Motion to suppress.* a. *Background.* Shortly after the robbery, a Toyota Camry automobile was stopped by two Boston police officers approximately one and one-half miles from the market. The vehicle was driven by a woman; the defendant and Lorenzo Beechman were in the vehicle with her. After the vehicle was stopped, the three occupants were removed from the vehicle and the vehicle was searched for weapons. In conducting the weapons search, a police officer picked up a heavy backpack in the rear passenger area and felt what he believed to be a gun barrel in the backpack. When he opened the backpack, he located

run concurrently with the other and with the sentences for being an armed career criminal and for armed masked robbery. He was sentenced to two years in a house of correction for unlawfully possessing ammunition, to run concurrently with the State prison sentences, and one year in a house of correction for illegally carrying a loaded firearm, to be served from and after the State prison sentences.

[2]We acknowledge the amicus brief filed by the Youth Advocacy Department of the Committee for Public Counsel Services.

a loaded revolver between two hardcover books. He also noticed a red bandana adjacent to the backpack on the floor of the rear passenger area. The victim was driven in a police cruiser to an area one block from where the Camry had been stopped, and the defendant was brought to the victim for a showup identification. The victim identified the defendant as the man with the red bandana on his face who had carried a firearm during the robbery.

The defendant moved to suppress the fruits of the stop and subsequent search, claiming that the stop of the vehicle was not supported by reasonable suspicion. The defendant appeals from the denial of the motion. In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact unless they are clearly erroneous but independently review the judge's ultimate findings and conclusions of law. See *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004), and cases cited.

We first summarize the facts found by the motion judge that are not clearly erroneous, supplementing them where necessary with undisputed facts in the record.[3] Approximately two minutes after the clerk was robbed at 4:58 P.M., Boston police Officer Matthew Fogarty responded to the scene. Shortly thereafter, he spoke with Thanh Nguyen, the store clerk, who told him that two "skinny" black males had entered the market, each wearing a bandana over his face. One of the robbers, whose hair was braided down to the middle of his neck, displayed a silver revolver to Nguyen. The robbers stole money and cigarettes and ran from the store. Nguyen chased after the robbers on foot but soon lost sight of them; Nguyen did not see them enter a vehicle, but he suspected that was how they got away.[4]

Approximately eight minutes after the robbery, an anonymous

---

[3]We rely on the judge's corrected memorandum of decision and order, which followed the defendant's motion to reconsider his earlier findings. "Appellate courts may supplement a judge's finding of facts if the evidence is uncontroverted and undisputed and where the judge explicitly or implicitly credited the witness's testimony." *Commonwealth* v. *Isaiah I.*, 448 Mass. 334, 337 (2007), and cases cited. The motion judge found the police officers' testimony at the hearing "truthful and accurate."

[4]The judge did not make any finding as to where Nguyen chased the robbers after they left the store. Officer Matthew Fogarty testified that Nguyen told him the robbers had turned left and had run toward Parkman Street, but the information broadcast to police advised that the robbers turned right in the direction of Centre Street. Because the judge made no finding as to where the

caller telephoned the community service line at the police station closest to the market. Because the call was not recorded and the police officer who answered the telephone call did not testify, the most reliable evidence of the content of the call was the "turret" tape recording, which includes the police department's broadcasts and communications following the robbery. On that recording, the police dispatcher reported that the caller had seen two black males "hop into" a silver or gold Toyota Camry automobile, with Massachusetts registration number 22CO77, and "they headed up Parkman Street towards Dorchester [Avenue] minutes ago after that robbery." The dispatcher also reported that the caller had said the vehicle was driven by a woman.[5]

When the officers checked vehicle registration records, they found no record of a vehicle with Massachusetts registration 22CO77. They knew that "CO" was an unusual letter combination in Massachusetts registration plates, and checked 22CD77 as an alternative.[6] Within a few minutes, they learned that Massachusetts registration 22CD77 was assigned to a gold or silver Toyota Camry registered to a woman and that investigative records revealed that this vehicle had earlier been stopped or investigated at locations in the Mattapan and Dorchester sections of Boston. A Toyota Camry with this registration was stopped by two police officers approximately one and one-half miles from the market within forty minutes of the robbery.[7]

The judge concluded that the stopping of the vehicle was

robbers ran, and because the evidence is in conflict, we do not reach any conclusion as to where the robbers ran after leaving the market.

[5]The motion judge found that the caller "saw two black males come out of the market" and enter the Toyota Camry. We conclude that the evidence at the motion hearing does not support a finding that the caller saw the two black men "come out of the market." The dispatcher did not report that the caller had claimed to see the men leave the market. Officer Fogarty initially testified at the motion hearing that the anonymous caller had reported seeing two black males leave the market "with their faces covered," but he admitted on cross-examination that the information about the men wearing masks and running from the store came from the store clerk, not the anonymous caller.

[6]At the motion hearing, Officer Fogarty testified that "O" is an unusual letter to be used in a Massachusetts registration plate, so they tried the letter combination "CD" because "D" can be mistaken for "O."

[7]Office Fogarty testified that the stop occurred within "ten or twelve minutes" of the robbery. The motion judge found that the Toyota Camry was stopped

lawful because the police had probable cause to believe that the vehicle was the getaway car used in the robbery. The judge also concluded that the police had probable cause to search the vehicle, and that the warrantless search was lawful under the automobile exception to the warrant requirement.[8]

b. *Discussion.* The defendant argues that the unrecorded anonymous call was insufficient to support the judge's finding of probable cause, or a finding of reasonable suspicion necessary to justify an investigatory stop. We focus first on the question whether the stop of the vehicle was supported by reasonable suspicion.

An investigatory stop is justified if the police have "reasonable suspicion, based on specific, articulable facts and reasonable inferences therefrom, that an occupant of the . . . motor vehicle had committed, was committing, or was about to commit a crime." *Commonwealth* v. *Alvarado*, 423 Mass. 266, 268 (1996), and cases cited. "When, as here, a police radio broadcast directs officers to make an investigatory stop of a motor vehicle, the stop is lawful only if the Commonwealth establishes both the indicia of reliability of the transmitted information and the particularity of the description of the motor vehicle." *Commonwealth* v. *Lopes*, 455 Mass. 147, 155 (2009). Here the dispatch contained sufficient particularity regarding the motor vehicle: it identified the type of automobile, its color, each number and letter of the registration plate in correct sequence, and the gender of the three occupants of the vehicle. See *Commonwealth* v. *Mubdi*, 456 Mass. 385, 395 (2010). The question

---

"about fifteen minutes after the robbery." The defendant contends that there is no support in the record for this finding, and that the computer-aided dispatch records reflect that the stop occurred thirty-eight minutes after the robbery. The Commonwealth claims that the stop occurred twenty-five to thirty minutes after the robbery. We do not find adequate support in the record for the judge's finding that the stop occurred "about fifteen minutes after the robbery" but conclude that it is undisputed that the stop occurred less than forty minutes after the robbery, which suffices for purposes of this appeal.

[8]The judge also concluded that the police acted lawfully in briefly detaining the defendant until Nguyen could be brought to the location of the vehicle stop for the showup identification, and that the one-on-one identification was not impermissibly suggestive because it was justified by the need promptly to determine whether there was a sufficient basis to arrest the defendant or to detain him further.

whether the suspicion was reasonable therefore turns on whether this information bore adequate indicia of reliability. *Id.*

"To establish the reliability of the information under art. 14 [of the Massachusetts Declaration of Rights], 'the Commonwealth must show the basis of knowledge of the source of the information (the basis of knowledge test) and the underlying circumstances demonstrating that the source of the information was credible or the information reliable (veracity test).' " *Id.* at 395-396, quoting *Commonwealth* v. *Lopes, supra* at 155-156. Where the standard is reasonable suspicion rather than probable cause, "a less rigorous showing in each of these areas is permissible." *Commonwealth* v. *Mubdi, supra* at 396, quoting *Commonwealth* v. *Lyons*, 409 Mass. 16, 19 (1990). Because there was no tape recording of the anonymous call, and the officer who took the call did not testify at the motion hearing, "our assessment of the caller's basis of knowledge is necessarily limited to the information provided by the police dispatch" that communicated the content of the call. *Commonwealth* v. *Mudbi, supra.*

The dispatch stated that the caller had personally witnessed two black men get into a silver or gold Toyota Camry bearing a registration plate 22CO77 (which the police quickly determined was 22CD77), and drive onto Parkman Street toward Dorchester Avenue. "An eyewitness's report to police of [a] recent, firsthand observation satisfies the basis of knowledge prong." *Commonwealth* v. *Depina*, 456 Mass. 238, 243 (2010). See *Commonwealth* v. *Costa*, 448 Mass. 510, 515 (2007).

The veracity test is more difficult for the Commonwealth to satisfy where, as here, the caller was anonymous. Because the caller was anonymous, there could be no evidence regarding the caller's past reliability or reputation for honesty. See *Commonwealth* v. *Mubdi, supra.* And because there was no evidence that the caller was identifiable by the police, there is "no reason to believe the caller needed to fear that he or she would be subject to a charge of filing a false report or any comparable consequence of providing false information to law enforcement." *Id.* at 397. See *Commonwealth* v. *Costa, supra* at 517 ("By providing information to the police after knowing that her call was being recorded, and that the number she was calling from

had been identified, . . . the caller placed her anonymity suf-
ficiently at risk such that her reliability should have been ac-
corded greater weight than that of an anonymous informant").

Where the caller is anonymous, there are at least two ways to
establish the caller's reliability. The first is through independent
corroboration by police observation or investigation of the
details of the information provided by the caller. See *Com-
monwealth* v. *Depina, supra* at 244; *Commonwealth* v. *Costa,
supra* at 514-515. See also *Florida* v. *J.L.*, 529 U.S. 266, 270
(2000), quoting *Alabama* v. *White*, 496 U.S. 325, 327 (1990)
(anonymous tip, suitably corroborated, may exhibit "sufficient
indicia of reliability to provide reasonable suspicion to make
the investigatory stop"). Independent corroboration is relevant
only to the extent that it was known to the police before the
stop was initiated; information learned during an investigative
stop cannot provide reasonable suspicion for the stop. See
*Commonwealth* v. *Barros*, 435 Mass. 171, 178 (2001), quoting
*Commonwealth* v. *Thibeau*, 384 Mass. 762, 764 (1981) ("[of-
ficer's] suspicion must be reasonable *before* the [stop] begins"
[emphasis in original]). Here, because the Commonwealth did
not present evidence from either of the two police officers
who initiated the stop of the vehicle, we must assume that the
stop was based solely on the vehicle's registration plate. The
evidence at the motion hearing does not shed light on whether
the corroborating information learned during the stop — that
the vehicle was driven by a woman whose passengers were
two black men, one of whom had long braided hair as described
by Nguyen — was known prior to the stop.

Even without this corroboration, there was some corrobora-
tion of the information provided by the anonymous caller. While
the evidence does not reflect whether the caller knew of the
robbery or saw the men wearing masks, we can infer the caller
recognized that they appeared to have just committed a crime
and were making their getaway; otherwise it would have made
no sense to contact the police and provide the registration plate
number of a departing vehicle.[9] In fact, there had been a rob-
bery of a market one block away from Parkman Street eight

---

[9]The defendant argues that we should interpret the anonymous call without
this inference and treat it as if some unknown caller reported to the police

minutes earlier that had been committed by two masked black men. There was also corroboration for the caller's report that the robbers had escaped in a vehicle, because Nguyen followed them on foot after they left the store but lost sight of them, which suggests that they had entered a waiting getaway car. There was corroboration of the caller's observation of the registration plate and the female driver because, once the police substituted a "D" for a "O," they learned that such a registration plate was assigned to a silver or gold Camry automobile that was owned by a woman in Dorchester. There was further corroboration in that this same vehicle was spotted within forty minutes of the robbery in a location that was approximately one and one-half miles from the market.

A second way to establish the caller's reliability is by demonstrating that the caller had just witnessed a startling or shocking event, that the caller described the event, and that the description of the event was made so quickly in reaction to the event as reasonably to negate the possibility that the caller was falsifying the description or was carrying out a plan falsely to accuse another. *Commonwealth* v. *Depina, supra* at 244.

> "Under our common law of evidence, we have recognized that a statement may be sufficiently reliable to be admitted in evidence as an exception to the hearsay rule where it is made in reaction to a startling or shocking event if its utterance was 'spontaneous to a degree which reasonably negated premeditation or possible fabrication and if it [tends] to qualify, characterize and explain the underlying event.' "

*Id.*, quoting *Commonwealth* v. *DiMonte*, 427 Mass. 233, 236 (1998). See Mass. G. Evid. § 803(2), at 254-255 (2011).

> "We need not decide whether this anonymous declarant's telephone call to the police would be admissible in

that two black men had entered a vehicle driven by a woman, who then drove away, and provided the license plate registration of the departing vehicle. The defendant notes, correctly, that this information, viewed in isolation, is unworthy of investigation. But we reject the suggestion that we should interpret the call as nonsensical. Instead, we infer that the caller telephoned for a reason, and the reason was to report to the police what the caller understood to be the description of a vehicle used by criminals fleeing the scene of their crime.

evidence at trial as an excited utterance (or whether its admission in that context would satisfy the confrontation clause of the Sixth Amendment to the United States Constitution, see *Commonwealth* v. *Burgess,* 450 Mass. 422, 426-430 [2008]) to decide that the excited nature of this telephone call supports the reliability of the caller by 'reasonably negat[ing] premeditation or possible fabrication.' "

*Commonwealth* v. *Depina, supra* at 245, quoting *Commonwealth* v. *DiMonte, supra.*

For purposes of evaluating the reliability of an anonymous caller in determining whether the police had reasonable suspicion to make an investigative stop, the anonymous call here may be comparable to an excited utterance. If a person wants to harass an enemy by providing false information to the police that would trigger an investigative stop, the person is unlikely to wait until the caller has just seen someone flee a crime scene. Compare *Commonwealth* v. *Depina, supra* (anonymous caller passes veracity test where she reported shooting in her "back yard" and witnessed person fleeing scene of shooting), with *Florida* v. *J.L., supra* at 268, 272 (anonymous caller's uncorroborated information that young black male at particular bus stop was carrying gun lacks indicia of reliability needed for reasonable suspicion), and *Commonwealth* v. *Mubdi,* 456 Mass. 385, 396-399 (2010) (anonymous caller's uncorroborated information that two black males in particular vehicle had been seen trading firearm for cash does not support reasonable suspicion).

We conclude that the anonymous caller here passed the less rigorous veracity test needed for reasonable suspicion where there was independent corroboration of the information furnished by the caller and where the call was made immediately after the startling event of observing two men who appeared to have just committed a crime make their getaway. In these circumstances, the police would have been remiss had they not conducted an investigative stop of this vehicle. See *Commonwealth* v. *Mercado,* 422 Mass. 367, 370 (1996), quoting *Terry* v. *Ohio,* 392 U.S. 1, 23 (1968) (failure to initiate investigatory stop would have been "poor police work indeed").

We also conclude that reasonable suspicion was all that was

necessary in these circumstances to justify stopping the vehicle, ordering the occupants of the vehicle out of the car, and detaining them until Nguyen could be brought to the scene to attempt a showup identification. While the motion judge only described the length of their detention before the identification as "brief," the undisputed evidence in the motion hearing record reveals that Officer Fogarty and Nguyen arrived at the location of the stop within one and one-half minutes, and the identification followed shortly thereafter. *Commonwealth* v. *Barros*, 425 Mass. 572, 585 (1997) ("defendant's brief detention occasioned by the necessity to transport a witness to the scene of a threshold inquiry is a reasonable part of such an investigatory stop"). We also conclude that the search of the vehicle for weapons, which occurred before the identification by Nguyen of the two men in the vehicle, was a permissible "frisk" of the vehicle during an investigative stop. See *Commonwealth* v. *Pagan*, 440 Mass. 62, 68-72 (2003) (search of backpack for weapons permissible in investigative stop where officer reasonably fears that suspect may be armed); *Commonwealth* v. *Robbins*, 407 Mass. 147, 152 (1990), quoting *Commonwealth* v. *Almeida*, 373 Mass. 266, 272 (1977) ("*Terry* type of search may extend into the interior of an automobile so long as it is limited in scope to a protective end"). We therefore need not address the judge's finding that the police had probable cause to arrest the defendants and search the vehicle at the time of the initial stop to affirm the judge's denial of the motion to suppress.

2. *Sentencing enhancement based on youthful offender adjudication of carjacking.* Under G. L. c. 269, § 10 (*a*), a defendant who is convicted of the unlawful carrying of a firearm "shall be punished by imprisonment in the state prison for not less than two and one-half years nor more than five years, or for not less than [eighteen] months nor more than two and one-half years in a jail or house of correction." But where a defendant convicted of this offense has been previously convicted of three violent crimes, as defined in G. L. c. 140, § 121, or three serious drug offenses, as defined in G. L. c. 269, § 10G (*e*), or some combination totalling three, he is characterized as an armed career criminal, level three,[10] and "shall be punished by

---

[10]This characterization is not set forth in G. L. c. 269, § 10G, but we have

imprisonment in the state prison for not less than fifteen years nor more than twenty years." G. L. c. 269, § 10G (*c*).[11]

As defined in G. L. c. 140, § 121, a "violent crime" means:

> "Any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or possession of a deadly weapon that would be punishable by imprisonment for such term if committed by an adult that: (i) has as an element the use, attempted use or threatened use of physical force or a deadly weapon against the person of another; (ii) is burglary, extortion, arson or kidnapping; (iii) involves the use of explosives; or (iv) otherwise involves conduct that presents a serious risk of physical injury to another."

The defendant claims that his prior adjudication as a youthful offender for carjacking is not a conviction of a "violent crime" and therefore may not be used to find him an armed career criminal, level three.[12]

referred to those convicted of the unlawful carrying of a firearm who are subject to sentencing under § 10G as armed career criminals. See *Commonwealth* v. *Johnson, ante* 44, 45 (2011); *Commonwealth* v. *Furr,* 454 Mass. 101, 104 (2009). The term "armed career criminal" derives from the Federal Armed Career Criminal Act of 1984, 18 U.S.C. § 924(e) (2006), which imposes a mandatory minimum sentence of fifteen years for those convicted of unlawfully possessing a firearm in violation of 18 U.S.C. § 922(g) (2006) who have three prior convictions of a "violent felony" or a "serious drug offense." The term is appropriately used only to characterize those with three prior convictions of a violent crime or serious drug offense who are sentenced under § 10G (*c*).

[11]Under G. L. c. 269, § 10G (*a*), a defendant convicted of the unlawful carrying of a firearm who has previously been convicted of a violent crime or a serious drug offense "shall be punished by imprisonment in the state prison for not less than three years nor more than [fifteen] years." Where a defendant convicted of this offense has been previously convicted of two violent crimes or two serious drug offenses, or one of each, he "shall be punished by imprisonment in the state prison for not less than ten years nor more than [fifteen] years." G. L. c. 269, § 10G (*b*).

A sentence imposed under § 10G may not be suspended or reduced to less than the minimum, and the defendant is not eligible for probation, parole, furlough, work release, or any deduction of time for good conduct until the defendant has served the minimum sentence. G. L. c. 269, § 10G (*d*).

[12]The defendant on appeal does not contest that he has a prior conviction of a violent crime (adjudication of delinquency by reason of assault and battery by means of a dangerous weapon) and of a serious drug offense (distribution of

The evidence in this second phase of the trial supported the jury's finding that on October 31, 2002, the defendant was convicted of carjacking in Juvenile Court as a youthful offender, in violation of G. L. c. 265, § 21A.[13] The elements of the offense of carjacking are that a defendant (1) with intent to steal a motor vehicle, (2) assaults, confines, maims, or puts any person in fear, (3) for the purpose of stealing the motor vehicle. G. L. c. 265, § 21A.[14] Therefore, the offense of carjacking "has as an element the use, attempted use or threatened use of physical force . . . against the person of another." G. L. c. 140, § 121. Because carjacking is a crime punishable by imprisonment for a term exceeding one year, there is no question that, if committed by an adult, it would constitute a "violent crime" that may be applied to enhance a sentence under § 10G. But if it were committed by a juvenile and deemed an "act of juvenile

and possession with intent to distribute a class B substance), and therefore is subject to a minimum mandatory sentence of ten years under G. L. c. 269, § 10G (*b*).

[13]Although G. L. c. 265, § 21A, includes the crime of armed carjacking, see note 14, *infra*, the defendant was not charged with being armed during the carjacking. Nor does the evidence in the second phase of the trial support a finding that he was armed. The police officer who investigated the carjacking testified he believed "there was a knife recovered from another individual there," but there was no evidence that the defendant participated with another person in committing the carjacking, that the knife was shown or otherwise used during the carjacking, or that the defendant knew that the other individual possessed a knife.

[14]General Laws c. 265, § 21A, provides:

"Whoever, with intent to steal a motor vehicle, assaults, confines, maims or puts any person in fear for the purpose of stealing a motor vehicle shall, whether he succeeds or fails in the perpetration of stealing the motor vehicle be punished by imprisonment in the state prison for not more than fifteen years or in a jail or house of correction for not more than two and one-half years and a fine of not less than one thousand nor more than fifteen thousand dollars; provided, however, that any person who commits any offense described herein while being armed with a dangerous weapon shall be punished by imprisonment in the state prison for not more than twenty years or in a jail or house of correction for not less than one year nor more than two and one-half years and a fine of not less than five nor more than fifteen thousand dollars. Whoever commits any offense described in this section while being armed with a firearm, rifle, shotgun, machine gun or assault weapon, shall be punished by imprisonment in the state prison for not less than five years in state prison."

delinquency," it would constitute a "violent crime" only where it involved "the use or possession of a deadly weapon," which the carjacking committed by the defendant did not. See note 13, *supra*.

Here, there is no dispute that the defendant was a juvenile when he committed the carjacking. The Commonwealth contends, however, that the nature of the juvenile adjudication determines whether an act committed by a juvenile is a "crime" that can be a "violent crime" without a finding of the use or possession of a deadly weapon, or an "act of juvenile delinquency" that can be a "violent crime" only with such a finding. According to the Commonwealth, where a child is adjudicated delinquent on a complaint after he is found to have committed a carjacking, the carjacking is an "act of juvenile delinquency," but where a child is adjudicated a youthful offender based on the same finding of proof beyond a reasonable doubt, the carjacking is a "crime."

The Commonwealth misconstrues the Legislature's purpose in enacting the law in 1996 that authorized the indictment of certain juveniles between the ages of fourteen and seventeen as youthful offenders.[15] We declared in *Commonwealth* v. *Connor C.*, 432 Mass. 635, 641-642 (2000):

> "[T]he provisions of the 1996 amendments did not eviscerate the longstanding principle that the treatment of children who offend our laws are not criminal proceedings. . . . [E]ven as to the category of children adjudicated 'youthful offenders,' the statute does not label a 'youthful offender' proceeding as 'criminal.' The distinction our law recognizes between child and adult adjudication exists partly to avoid the infringement of a child's constitutional rights, and partly to avoid the attachment of criminal stigma to children who may be amenable to rehabilitation. . . . The 1996 amendments did not alter that fundamental policy determination by the Legislature."

---

[15]A juvenile may be indicted as a youthful offender if he is between the age of fourteen and seventeen years and is accused of a crime that, if he were an adult, would be punishable by imprisonment in State prison, and has either previously been committed to the Department of Youth Services or has committed an offense that involves the infliction of serious bodily harm or a violation of a firearm offense set forth in G. L. c. 269, § 10 (*a*), (*c*), or (*d*), or § 10E. G. L. c. 119, § 52.

Unjustified acts of violence are illegal, whether they are committed by a juvenile or an adult, but when committed by a juvenile the Legislature chose to characterize them as acts of delinquency rather than as crimes because juvenile proceedings are not criminal proceedings even where the child is indicted as a youthful offender. General Laws c. 119, § 53, which has remained unchanged since the chapter's original enactment in 1906 (see St. 1906, c. 413, § 2, entitled "An Act relative to delinquent children"), provides:

"Sections fifty-two to sixty-three, inclusive [the sections comprising the part entitled 'delinquent children'], shall be liberally construed so that the care, custody and discipline of the children brought before the court shall approximate as nearly as possible that which they should receive from their parents, and that, as far as practicable, they shall be treated, not as criminals, but as children in need of aid, encouragement and guidance. Proceedings against children under said sections shall not be deemed criminal proceedings."

See R.L. Ireland, Juvenile Law § 1.2, at 14 n.4 (2d ed. 2006). While the Legislature in 1996, in response to growing concern about juveniles committing more serious offenses, authorized that more serious juvenile offenders be indicted as "youthful offenders," it still required youthful offenders to be tried in the Juvenile Court (or a juvenile session of a District Court) and did not exclude them from the dictates of § 53. See G. L. c. 119, §§ 52, 54, 58; *Commonwealth* v. *Connor C.*, *supra* at 637-640; *Commonwealth* v. *Dale D.*, 431 Mass. 757, 758-759 (2000). See also R.L. Ireland, Juvenile Law, *supra* at 16-18. Therefore, an adjudication of a juvenile as a youthful offender subjects him to more severe penalties, including State prison sentences, see G. L. c. 119, § 58, but it does not transform his illegal act from an act of delinquency into a crime, and does not change the statutory obligation to treat him "as far as practicable" as a child "in need of aid, encouragement and guidance" rather than as a criminal. G. L. c. 119, § 53. See *Commonwealth* v. *Connor C.*, *supra* at 641-642.

We also note that G. L. c. 269, § 10G, was inserted by St. 1998, c. 180, § 71, two years after the Legislature authorized that juveniles could be indicted as youthful offenders through

the amendments to G. L. c. 119. See St. 1996, c. 200, § 1. "In interpreting a statute, we presume that when the Legislature enacts a law it is aware of the statutory and common law that governed the matter in which it legislates." *Globe Newspaper Co., petitioner, ante* 113, 117 (2011). Thus, we presume that the Legislature knew that certain juveniles could be tried as youthful offenders when it enacted § 10G, and recognized that an "act of juvenile delinquency" may constitute a "violent crime" under G. L. c. 140, § 121, that may be used to enhance a firearm sentence only where it involved "the use or possession of a deadly weapon." *Id.* We also presume that, if the Legislature wished youthful offender adjudications to be treated as adult convictions and to be used as predicate offenses under § 10G without proof of "the use or possession of a deadly weapon," it would have done so expressly. See, e.g., G. L. c. 119, § 60A, as amended through St. 1996, c. 200, § 6 (records of youthful offender proceedings "shall be open to public inspection in the same manner and to the same extent as adult criminal court records"). The Legislature's failure to do so here suggests that it intended that an "act of delinquency" under § 121 not depend on whether the juvenile is treated as a delinquent child or a youthful offender.

By adopting the definition of "violent crime" in G. L. c. 140, § 121, in the sentencing enhancement provisions of G. L. c. 269, § 10G, with its reference to acts of delinquency, the Legislature reflected its intention to define a juvenile adjudication as a "conviction," as that term is used in § 10G. See *Commonwealth v. Foreman*, 63 Mass. App. Ct. 801, 802 (2005); *Commonwealth v. Furr*, 58 Mass. App. Ct. 155, 157-158 (2003). See also *Commonwealth v. Connor C., supra* at 646 (previous adjudication of delinquency for violation of G. L. c. 269, § 10 [*a*], [*c*], or [*d*], is " 'conviction' as that term is used in G. L. c. 269, § 10 [*d*]").[16] But it also reflected its intention that, where a defendant has been previously "convicted" as a juvenile of a

---

[16]We emphasize, as we did in *Commonwealth v. Connor C.*, 432 Mass. 635, 646 (2000), that this definition of "conviction" is limited to these statutory provisions, and that "[w]e adhere to our long-standing jurisprudence that an 'adjudication' that a child has violated a law generally is not a 'conviction' of a crime." See, e.g., *Department of Youth Servs. v. A Juvenile*, 384 Mass. 784, 786 (1981).

"violent crime," the prior "conviction" should trigger the enhanced sentencing provisions of § 10G only where the act of juvenile delinquency, apart from the other requirements, involves "the use or possession of a deadly weapon." Because the defendant was not "convicted" as a juvenile of armed carjacking, where "being armed with a dangerous weapon" is an element of the offense, see G. L. c. 265, § 21A, and because the evidence in the second phase of trial was not sufficient to support a finding that the defendant's "conviction" of unarmed carjacking involved "the use or possession of a deadly weapon," this prior adjudication did not constitute a "conviction of a violent crime" for purposes of § 10G, and should not have been used as a third predicate conviction in finding the defendant an armed career criminal under § 10G (*c*). We therefore vacate the defendant's sentence under § 10G (*c*), and order that he be resentenced under § 10G (*b*), based on his prior convictions of one violent crime and one serious drug offense.

3. *Duplicative convictions.* The defendant argues that his convictions of armed robbery and assault by means of a dangerous weapon are duplicative.[17]

In *Commonwealth* v. *Vick*, 454 Mass. 418, 431 (2009), we declared:

> "The traditional rule in Massachusetts, as embodied in *Morey* v. *Commonwealth*, 108 Mass. 433, 434 (1871) (*Morey*), and its progeny, is that 'a defendant may properly be punished for two crimes arising out of the same course of conduct provided that each crime requires proof of an element that the other does not.' *Commonwealth* v. *Valliere*, 437 Mass. 366, 371 (2002). . . . This elements-based approach remains the standard for determining whether multiple convictions stemming from one criminal

---

[17]The defendant also argues that his convictions of unlawfully carrying a loaded firearm and unlawfully possessing ammunition are duplicative. The Commonwealth concedes that the offense of unlawfully possessing ammunition is a lesser included offense of unlawfully carrying a loaded firearm where, as here, the only ammunition allegedly possessed was loaded in the firearm. We agree that the two convictions are duplicative and that the conviction of the lesser included offense (unlawful possession of ammunition) must be vacated. See *Commonwealth* v. *Johnson, ante* 44, 52-54 (2011).

transaction are duplicative. . . . As long as each offense requires proof of an additional element that the other does not, 'neither crime is a lesser-included offense of the other, and convictions on both are deemed to have been authorized by the Legislature and hence not [duplicative].' *Commonwealth* v. *Jones*, 382 Mass. 387, 393 (1981)." (Citations omitted.)

Applying this rule, a conviction of armed robbery is not duplicative of a conviction of assault by means of a dangerous weapon. The elements of the crime of armed robbery are that a defendant, while armed with a dangerous weapon, assaulted another person, and took money or property from the person with the intent to steal it. G. L. c. 265, § 17. See *Commonwealth* v. *Rogers*, 459 Mass. 249, 252-253 & n.4 (2011); Massachusetts Superior Court Criminal Practice Jury Instructions § 2.27.1 (Mass. Continuing Legal Educ. 1999 & 1st Supp. 2003). A defendant need not have used or displayed the dangerous weapon during the robbery; it is sufficient that the prosecutor prove that the robber possessed the dangerous weapon during the robbery. See *Commonwealth* v. *Rogers*, *supra* at 252 n.4. In contrast, the elements of assault by means of a dangerous weapon are that a defendant committed an assault, and that the assault was committed by means of a dangerous weapon. G. L. c. 265, § 15B (*b*). See *Commonwealth* v. *Santos*, 440 Mass. 281, 293 (2003). Therefore, armed robbery has a required element — the theft of money or property — that is not required to prove assault by means of a dangerous weapon, and assault by means of a dangerous weapon has a required element — the use of a dangerous weapon to commit the assault — that is not required to prove armed robbery. *Id.* The two convictions are therefore not duplicative. See *Commonwealth* v. *Vick*, *supra*.

In reaching this conclusion, we overrule the contrary conclusion we reached in *Commonwealth* v. *Santos*, *supra* at 293-294. In that case, we acknowledged that the crime of assault by means of a dangerous weapon was not "[t]echnically" a lesser included offense of armed robbery, because each required an element not required in the other, but concluded that it was effectively a lesser included offense in the circumstances of that case because the robbery was perpetrated in an assault by means

of a dangerous weapon — the defendant pointed the gun at the victims' heads and demanded money. *Id.* at 293-294 & n.7. We vacated the conviction of assault by means of a dangerous weapon because, "[a]s presented and argued, these crimes were so closely linked as to render the assault by means of a dangerous weapon conviction duplicative of the conviction of armed robbery." *Id.* at 294.

More recently, in our decision in *Commonwealth* v. *Vick, supra* at 433, we acknowledged:

> "[I]t may appear that our well-established, elements-based approach to analyzing purported duplicative convictions, as first articulated in *Morey*, has been expanded over the years to permit a conduct-based analysis of the facts of a particular case to determine whether a defendant's acts in one criminal event are so closely related as to constitute in substance a single crime such that the defendant can be punished only for the greater offense."

But we clarified in the *Vick* decision that, in determining whether convictions are duplicative, we adhere to the elements-based approach and reject the closely related conduct-based approach except where one crime is a lesser included offense of the other, or where there are multiple counts of the same offense. *Id.* at 433-435, and cases cited.

4. *Conclusion.* We vacate the defendant's conviction of unlawful possession of ammunition and affirm the remaining convictions. We also vacate the finding that the defendant is an armed career criminal, level three, subject to a sentence under G. L. c. 269, § 10G (*c*), and order that he be resentenced under § 10G (*b*), based on his prior convictions of one violent crime and one serious drug offense. Because we recognize that the judge's sentence under § 10G (*c*) may have affected the sentences he imposed on the other convictions, we order that the defendant be resentenced as to all the convictions that have been affirmed. We remand the case to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*