SUPERIOR COURT 
 
 COMMONWEALTH v s. RICARDO CHARLES

 
 Docket:
 22-206
 
 
 Dates:
 August 18, 2025
 
 
 Present:
 Peter B. Krupp
 
 
 County:
 NORFOLK
 

 
 Keywords:
 MEMORANDUM AND ORDER ON MOTION TO SUPPRESS EVIDENCE AND STATEMENTS FROM AUTOMOBILE STOP, EXIT ORDER AND PATFRISK
 
 

             Ricardo Charles is charged with trafficking more than 18 grams of cocaine following a motor vehicle stop on April 16, 2022 in Quincy. He moves to suppress the fruits of that stop. After an evidentiary hearing, during which the Commonwealth called four members of the Quincy Drug Control Unit (“Quincy DCU”), Det. Bryan Donovan, Det. Gerard O’Rourke, K-9 Off. Stephen Dabilis, and Det. Jeffrey Bossart, and based on the following factual findings, the motion must be allowed.
FINDINGS OF FACT
            Based on the preponderance of the credible evidence, and the reasonable inferences that may be drawn therefrom, I make the following factual findings:
            The relevant officers of the Quincy DCU were working the 4 p.m. to midnight shift on April 16, 2022. The Quincy DCU officers were not required to go to the Quincy police station at the beginning of their shift or to attend roll call. Instead, on April 16, 2022, while in their separate unmarked vehicles, they began working at around 4 p.m. in the “delta” area of Quincy, which was the area around Quincy Square and the south Quincy area.
 
                                                            -1-
 
            At about 4:30 p.m. on April 16, 2022, Det. Donovan was in an unmarked vehicle in the vicinity of 36 Elm St. in Quincy when he saw a black male driving a white Mercedes on Elm Street with a small pitbull-looking dog in the vehicle.[1] Det. Donovan was aware that at least one user of illegal drugs lived at 36 Elm St. and the police had responded to that address in connection with drug overdoses in the past. Det. Donovan did not recognize the driver of the Mercedes. The Mercedes did not slow down or stop at 36 Elm St., or otherwise show any knowledge or familiarity with that address, but merely passed by on Elm Street. Nonetheless, Det. Donovan queried the license plate of the Mercedes.[2]
            Upon conducting this query from his unmarked vehicle, Det. Donovan learned that the Mercedes was registered to Marie Charles (“Marie”), an older black female. According to the Registry of Motor Vehicles (“RMV”) records that Det. Donovan reviewed, the Mercedes was properly registered and inspected, and had not been reported stolen. Det. Donovan also learned that a younger black male, Vladimir Charles (“Vladimir”), lived at Marie’s address, and that Vladimir had a criminal record for drug and firearm offenses. Det. Donovan did not know who was driving the Mercedes.[3]
 
--------------------------------------------
 
            [1]        I do not know if Det. Donovan was stationary or moving when he made this observation.
            [2]        Det. Donovan could not say whether this was the first license plate he queried on April 16, 2022 after beginning his shift.
            [3]        Det. Donovan saw the photograph of Vladimir on file with the RMV. It depicted a black male with a big bushy beard and a skin color darker that the driver of the Mercedes. The driver of the Mercedes did not have a bushy beard. Det. Donovan did not know, or have a good faith basis to believe, that Vladimir was the driver.
 
                                                            -2-
 
            Det. Donovan alerted the other Quincy DCU officers to place the Mercedes under observation.[4] Det. Donovan saw the Mercedes take a right on Dysart St. and he followed it, although not immediately. The Mercedes drove down Dysart St. and turned left into the driveway at 54 Dysart St. Det. Donovan had no information about any drug activity at 54 Dysart St. Det. Donovan pulled into a driveway on the opposite side of, but further down, Dysart St. from #54.
            From his position a distance away, Det. Donovan saw a male come from the side of 54 Dysart St. and approach the driver’s window of the Mercedes for a short conversation before walking back toward the side door at 54 Dysart St. Det. Donovan did not recognize the male. He did not see any hand-to-hand exchange or see anything picked up or dropped off while the male was speaking to the driver of the Mercedes. He did not see anything in the male’s hand before or after he approached the Mercedes and did not see the male reach into his pocket or any other area so as to conceal anything during or after his meeting with the driver of the Mercedes. Nor did Det. Donovan see the male blade or turn his body in any way to shield from view anything he may have been carrying.
 
--------------------------------------------
 
            [4]        This manner of law enforcement is strongly suggestive of profiling. When Det. Donovan queried the Mercedes, he had no information about the driver or vehicle to suggest it was doing anything wrong. As a member of the Quincy DCU, he was clearly on the lookout for unlawful drug activity. Would Det. Donovan have queried the Mercedes if it was driven by a white male? When Det. Donovan placed the Mercedes under surveillance, he had no information about who the driver was, no information that the driver had committed any crime or even any motor vehicle infraction, and no suggestion that the vehicle had previously been observed or investigated for involvement with any criminal activity. Would he have placed the Mercedes under surveillance if it was driven by a white male? The only things Det. Donovan knew was that the Mercedes was being driven by a black male and that a person at the residence where the vehicle was registered had a criminal history. Although the evidence suggests that the driver’s race may have played a role in Det. Donovan’s actions (either when he decided to query the vehicle’s plates or when he decided to place the vehicle under surveillance), defendant does not raise an equal protection challenge to the stop. See Commonwealth v. Dilworth, 494 Mass. 579, 586-687 (2024); Commonwealth v. Robinson-Van Rader, 492 Mass. 1, 18-20 (2023);
Commonwealth v. Long, 485 Mass. 711, 715 (2020).
 
                                                            -3-
 
            After the male left the side of the Mercedes, Det. Donovan saw the Mercedes back out of the driveway at 54 Dysart St. and drive further down Dysart St. Det. Donovan testified that he believed that the interaction at the side of the Mercedes was a drug transaction. Given his location, and the absence of any observations of an exchange, Det. Donovan’s subjective belief was little more than a hunch or speculation.
            After the Mercedes left the area, Det. Donovan proceeded to 54 Dysart St. together with Det. Glennon. After Det. Donovan knocked on the door, the male who had gone to the window of the Mercedes ultimately came to the door. Det. Donovan identified himself as a Quincy police officer. The male identified himself as Tarik Williams (“Williams”). Det. Donovan questioned Williams about the person he had just met with. Williams said that the person was his friend “P,” who had come by to check out a tire on a car. Det. Donovan said he did not believe that was true, but Williams persisted. Det. Donovan asked Williams if he had any text messages related to the tire. Det. Donovan and Det. Glennon asked Williams to show them any such text messages, kept telling Williams they believed he was lying about the tire, and put pressure on Williams so that they (Dets. Donovan and Glennon) could get into 54 Dysart St.[5] Ultimately, Dets. Donovan and Glennon entered 54 Dysart St.
            While Dets. Donovan and Glennon were engaged with Williams, other officers, including Det. O’Rourke, Det. Bossert and Off. Dabilis, followed the Mercedes, beginning when it turned off of Dysart St. They followed the Mercedes for only about five minutes before it was stopped. The Mercedes stopped briefly at a gas station and then proceeded from School Street to Granite Street to Quarry Street. The Mercedes did not come to a complete stop at two stop signs on
 
--------------------------------------------
 
            [5]        The Quincy DCU officers were not equipped with body cameras, so their interactions with Williams and others at 54 Dysart St. are not preserved. Williams and Det. Glennon were not called to testify at the suppression hearing. Neither Det. Donovan nor Det. Glennon authored a report about this incident.
 
                                                            -4-
 
Quarry St. When the Mercedes was on Quarry St., Off. Dabilis, who was driving a low-profile, black police vehicle with a drug-sniffing canine in tow, initiated a stop of the Mercedes by activating his blue lights and sirens. The Mercedes pulled to a stop appropriately. The police did not observe the driver engage in any furtive movements or see him do anything alarming.
            The police officers concede that this was an investigatory stop. Although the surveilling officers saw the Mercedes proceed through two stop signs without fully stopping, they did not stop the vehicle due to any motor vehicle infraction. After the Mercedes pulled to the side of the road, Off. Dabilis, followed by Det. O’Rourke, approached the vehicle. Defendant was the only occupant in the vehicle. Off. Dabilis asked defendant for his license and registration and, to further the investigation, immediately asked defendant where he was coming from. Defendant said he had been at a pet store.[6] Det. O’Rourke, who was right behind Off. Dabilis, then directed defendant to step out of the Mercedes and, when defendant did so, Off. O’Rourke asked him to step to the rear of the Mercedes. Defendant was very cooperative, did not evidence any nervousness, and his answers were appropriate to the police questions. The officers did not have any specific concerns for their own safety and had no information or other good faith basis to believe that defendant was armed or dangerous.
            At the rear of the vehicle, Det. Bossart, who had just arrived on scene, conducted a pat frisk of defendant and felt what he believed were narcotics in defendant’s pants pocket. An officer placed defendant in handcuffs and Det. Bossart removed from defendant’s pants pocket a plastic bag containing a number of other bags believed to contain cocaine. At the time of the stop and search of defendant, the police were only aware of Det. Donovan’s suspicion that he had
 
--------------------------------------------
 
            [6]        The police did not know if defendant had been to a pet store and did not ask follow-up questions to determine if defendant had stopped anywhere else after going to the pet store.
 
                                                            -5-
 
witnessed a drug transaction and that the individual who had met with defendant outside 34 Dysart St. had said that defendant had come by in connection with a tire. The police later searched the Mercedes incident to defendant’s arrest.
            While the other officers were surveilling and stopping the Mercedes, and after they searched defendant, Dets. Donovan and Glennon secured entry to 34 Dysart St. They proceeded into a room in 34 Dysart St and found two females sitting on a mattress without sheets. Det. Donovan continued to ask for whatever Williams had obtained from defendant. Ultimately, after some delay, one of the women pulled out a plastic bag containing white powder from under the mattress. Det. Donovan or Det. Glennon radioed to the other Quincy DCU officers that they had recovered what was they believed to be fentanyl. By the time Dets. Donovan and Glennon recovered this plastic bag and radioed this information to others, defendant had already been stopped, searched and placed into custody as a result of the stop of the Mercedes.
DISCUSSION
            To justify an investigatory motor vehicle stop, the police must have “reasonable suspicion, based on specific, articulable facts and reasonable inferences therefrom that an occupant of the . . . motor vehicle has committed, was committing, or was about to commit a crime.” C ommonwealth v. Anderson, 461 Mass. 616, 621, cert. denied, 568 U.S. 946 (2012) quoting C ommonwealth v. Alvarado, 423 Mass. 266, 268 (1996). If “a police radio broadcast directs officers to make an investigatory stop of a motor vehicle, the stop is lawful only if the Commonwealth establishes both the indicia of reliability of the transmitted information and the particularity of the description of the motor vehicle.” Anderson, 461 Mass. at 621, quoting Commonwealth v. L opes, 455 Mass. 147, 155 (2009).
 
                                                            -6-
 
            The officers concede that they did not stop the Mercedes due to any traffic infraction, but instead did so to further their drug investigation. At the time of the investigatory stop, however, the police lacked reasonable suspicion to stop the vehicle for such purposes. See generally
C ommonwealth v. S oriano-Lara, 99 Mass. App. Ct. 525, 528-532 (2021) (officer’s “digression into general investigative questioning of the defendant was constitutionally impermissible”). At the time of the stop, the police only had Det. Donovan’s hunch that a drug transaction had occurred between the driver of the Mercedes (defendant) and Williams, and that Williams had provided what Det. Donovan reasonably believed was an evasive answer when asked about the meeting. At most, this amounted to a hunch that a drug offense had been committed. Commonwealth v. Warren, 475 Mass. 530, 534 (2016) (a hunch does not amount to reasonable suspicion). Indeed, Det. Donovan’s observations were entirely consistent with innocent conduct and, absent more information about defendant or Williams, his hunch did not rise to the level of reasonable suspicion. See, e.g., Commonwealth v. Clark, 65 Mass. App. Ct. 39, 43-45 (2005) (officer’s observation of defendant meeting another late at night “in a high drug area,” handing something to the other person, and then counting money only amounted to “a mere hunch” and “reasonable suspicion for the stop was lacking”).
            The specialized training of a police officer is not a substitute for factual observations upon which a trained police officer may base a reasonable suspicion that a particular interaction involved the surreptitious distribution of drugs. See, e.g., Commonwealth v. Kearse, 97 Mass. App. Ct. 297, 301-302 (2020) (“A quick hand shake in a high crime area between individuals unknown to the police, even when viewed by an experienced investigator, standing alone, does not provide more than a hunch that a drug transaction occurred . . . The fact that [the officer] was an experienced drug investigator, while relevant to an assessment of reasonable suspicion, is
 
                                                            -7-
 
not a substitute for details about how drug transactions occur based on that experience.”). Here, in contrast even to Kearse, the police did not even see any physical contact – let alone any exchange – between defendant and Williams.
            This case is also very different from the factual situation in Commonwealth v. Stewart, 469 Mass. 257 (2014), upon which the Commonwealth relies. See Commonwealth’s Opposition to Defendant’s Motion to Suppress Evidence and Statements at 4-5 (Docket #10). In Stewart, the observing officer knew defendant had previously been arrested for distributing narcotics to an undercover officer in the very same area three years earlier; and saw defendant, with three persons following him, walk down a narrow street often used by drug users, one of the people following was counting currency as she walked, and then the four huddled briefly together in a doorway before dispersing. 469 Mass. at 260-261. In comparison, in the instant case the police did not know defendant or Williams, saw no cash (or either party carrying anything), and knew nothing about 34 Dysart St. being involved in any drug activity.
            The police also lacked a constitutional basis to issue an exit order or conduct a pat frisk of defendant. As Supreme Judicial Court explained five years ago:
[A]n exit order is justified during a traffic stop where (1) police are warranted in the belief that the safety of the officers or others is threatened; (2) police have reasonable suspicion of criminal activity; or (3) police are conducting a search of the vehicle on other grounds . . . Thus, in the absence of reasonable suspicion of a crime or justification to search the vehicle on other grounds, an exit order is justified during a traffic stop if officers have a reasonable suspicion of a threat to safety. A lawful patfisk, however, requires more; that is, police must have a reasonable suspicion, based on specific articulable facts, that the suspect is armed and dangerous.
Commonwealth v. Torres-Pagan, 484 Mass. 34, 38-39 (2020) (emphasis added, citation omitted).
 
                                                            -8-
Accord I d. at 36 (“During a stop for which there is constitutional justification, . . . a patfrisk is permissible only where an officer has reasonable suspicion that the suspect is armed and dangerous.”).
            Here the exit order, which immediately followed the stop, and occurred even before the police ran defendant’s license and registration, was not supported by reasonable suspicion or by a well-grounded fear for the safety of the officers or others. Nor was the patfrisk of defendant permitted because, again, the police lacked reasonable suspicion to believe that defendant was armed or dangerous.
ORDER
            Defendant’s Motion to Suppress Evidence and Statements from an Unconstitutional Automobile Stop, Exit Order, and Patfrisk (Docket #8) is ALLOWED.
Dated:
/s/Peter B. Krupp
Justice of the Superior Court
August 18, 2025